Sheldon Peters **WOLFCHILD,**
et al., **Plaintiffs,**

v.

**UNITED STATES, Defendant.**

Stanley F. **Cermak,** et al., **Plaintiffs,**

v.

**United States, Defendant.**

Nos. 03–2684L, 01–568L.

United States Court of Federal Claims.

Aug. 22, 2006.

Benjamin Longstreth, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C, for defendant in No. 03–2684L. With him on the briefs was Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division. Of counsel was Angela Kelsey, Department of the Interior, Washington, D.C.

Eric J. Magnuson, Rider Bennett, L.L.P., Minneapolis, MN, for the Lower Sioux Indian Community, an applicant for intervention. With him on the briefs was Peter D. Gray, Rider Bennett, L.L.P., Minneapolis, MN.

Jack E. Pierce, Minneapolis, MN, for the applicants for intervention in the following groups: Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy.

Kelly Stricherz, Vermillion, SD, for the Mozak group of applicants for intervention.

Garrett J. Horn, Yankton, SD, for the Saul, Trudell, Taylor, Ferris, Henry, and Vassar groups of applicants for intervention.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of applicants for intervention.

Elizabeth Walker, Alexandria, VA, for the anonymous Walker group of applicants for intervention.

Robin L. Zephier, Abourezk & Zephier, P.C., Rapid City, SD, for the Zephier group of applicants for intervention.

Larry Leventhal, St. Paul, MN, for the Burley group of applicants for intervention. With him on the briefs was David Garelick, St. Paul, MN.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN, for the Lafferty, Blaeser, Whipple, and Lowe groups of applicants for intervention.

Sam S. Killinger, Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, L.L.P., Sioux City, IA, for the Enyard group of applicants for intervention.

Bernard J. Rooney, Amherst, WI, for the Rooney group of applicants for intervention.

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for plaintiffs in No. 03–2684L. With him on the brief were William F. Mohrman and Charles R. Shreffler, Mohrman & Kaardal, P.A., Minneapolis, MN.

Scott A. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of applicants for intervention. With him on the briefs was Todd M. Johnson, Johnson Law Group, Minnetonka, MN.

James L. Blair, Renaud, Cook, Drury, Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of applicants for intervention. With him on the briefs was Barry P. Hogan, Renaud, Cook, Drury, Mesaros, PA, Phoenix, AZ.

Gary J. Montana, Osseo, WI, for the DuMarce group of applicants for intervention. With him on the briefs was Ron Volesky, Huron, SD.

Nicole N. Emerson, Sioux Falls, SD, for the Garreau group of applicants for intervention.

Douglas Kettering, Yankton, SD, for the Ke Zephier group of applicants for intervention.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of applicants for intervention. With him on the briefs was Robert J. Leighton, Jr., Nolan, MacGregor, Thompson & Leighton, St. Paul, MN.

Frances Felix, pro se, Minneapolis, MN, for herself and members of the Felix family as applicants for intervention.

Steve Gaskins, Flynn, Gaskins & Bennett, Minneapolis, MN, for Dennis Prescott and Joseph Goodthunder, applicants to file a brief as amici curiae.

Lawrence H. Crosby, Crosby & Associates, St. Paul, MN, for plaintiffs in No. 01–568L.

William J. Shapiro, United States Department of Justice, Environment & Natural Resources Division, Sacramento, CA, for defendant in No. 01–568L. With him on the briefs was Sue Ellen Wooldridge, Assistant Attorney General, Environment and Natural Resources Division, Washington, DC.

### OPINION AND ORDER

LETTOW, Judge.

This Indian trust case has been brought by over 4,000 individuals claiming descent from those persons who were members of the Mdewakanton band of Sioux Indians and who assisted settlers in Minnesota during the "1862 Sioux Outbreak" of hostilities (the "loyal Mdewakanton"). *See Wolfchild v. United States,* 62 Fed.Cl. 521, 526–29 (2004) (*"Wolfchild I"*) (recounting the history of the 1862 Sioux Outbreak and the subsequent posture of the loyal Mdewakanton). Pending before the court are sets of motions that have their foundation in the court's prior decisions reported in *Wolfchild I* and *Wolfchild v. United States,* 68 Fed.Cl. 779 (2005) (*"Wolfchild II"*). This is a collective form of action brought under the Tucker Act, 28 U.S.C. § 1491(a), and the Indian Tucker Act, 28 U.S.C. § 1505, by an "identifiable group of American Indians," 28 U.S.C. § 1505, namely, in this case, the lineal descendants of the loyal Mdewakanton. In such a collective form of action, one of the court's early responsibilities is to provide an orderly means for "joinder of additional parties." *Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 173, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The pending motions represent the culmination of that process, as foreshadowed in *Wolfchild I,* 62 Fed.Cl. at 552–55, and *Wolfchild II,* 68 Fed.Cl. at 795–801.

The party-related motions addressed by this opinion consist primarily of a motion by plaintiffs for leave to amend their complaint to add several thousand additional plaintiffs, motions to intervene by a further several thousand potential intervening plaintiffs, a motion related to disposition or consolidation of a related case, a motion by one of the Indian communities now charged by the United States with administering some of the trust property to intervene as a party aligned as a plaintiff, and a motion for issuance of summonses to two other Indian communities also accorded by the United States with the responsibility of administering some trust property.

### BACKGROUND

In *Wolfchild I,* the court granted plaintiffs' cross-motion for partial summary judgment that (1) a trust was created in connection with, and as a consequence of, provisions in Appropriation Acts for the Department of the Interior in 1888, 1889, and 1890 ("Appro-

priations Acts")[1] that provided money to be expended under specific directions for the benefit of the loyal Mdewakanton and their lineal descendants,[2] which trust included land, improvements to land, and monies as the corpus, (2) such trust was neither extinguished nor terminated by the Act of December 19, 1980, Pub.L. No. 96–557, 94 Stat. 3262 (the "1980 Act"), which converted interests of the United States in the property at issue to a holding in trust for three Indian communities located in Minnesota,[3] and (3) the trust engendered by the Appropriation Acts was breached by the United States through actions taken in December 1980 and thereafter. See Wolfchild I, 62 Fed.Cl. at 555.[4]

In Wolfchild II, the court addressed the government's motion for reconsideration of the court's determination in Wolfchild I that a trust was created in connection with and as a consequence of the Appropriation Acts for descendants of persons who met the criteria specified in the Acts for inclusion in the group of beneficiaries. See Wolfchild II, 68 Fed.Cl. at 784–95. In support of its motion for reconsideration, the government proffered voluminous materials generated during the Department of the Interior's administration of the lands purchased in accord with the terms of the Appropriation Acts (the "1886 lands"). The court previously had considered most of these materials, but some new documents were provided. In addition, the government put forward arguments that drew upon later statutory enactments in 1901, 1906, 1923, and 1944. After conducting a thorough review of these materials and arguments, the court concluded that, contrary to the government's contentions, the materials were all consistent with the existence of a trust and accordingly denied the motion for reconsideration. Id. at 794–95.

1. The three Appropriation Acts are the Act of June 29, 1888, 25 Stat. 217, 228–29; the Act of March 2, 1889, 25 Stat. 980, 992–93; and the Act of August 19, 1890, 26 Stat. 336, 349. The pertinent provisions of these Acts are quoted in Wolfchild I, 62 Fed.Cl. at 527–28 & nn. 4–5.

2. The trust beneficiaries were expressly defined in the Appropriation Acts as "Indians in Minnesota heretofore belonging to the Medawakanton [sic] band of Sioux Indians, who have resided in said State since … [May 20, 1886] … and have severed their tribal relations." Act of Mar. 2, 1889, 25 Stat. at 992. These Indians were loyal to the United States during the Sioux Outbreak in August 1862 in Minnesota, in which more than 500 white settlers and numerous Indians were killed. See Wolfchild I, 62 Fed.Cl. at 526. Many of the loyalists lost their homes and property because of their aid to whites, and shortly after the outbreak, Congress concluded that "now they cannot return to their tribe … or they would be slaughtered for the part they took in the outbreak." Id. (quoting Cong. Globe, 38th Cong., 1st Sess. 3516 (1864)).

The statutory reference to the Indians "who have resided in said State since … [May 20, 1886]," was to a census prepared by U.S. Special Agent Walter McLeod, who acted at the behest of the Commissioner of Indian Affairs to determine those Mdewakanton Indians who were loyal to the United States during the 1862 Outbreak, who had renounced their tribal relations, and who had remained in Minnesota. See Wolfchild I, 62 Fed.Cl. at 528.

The beneficiaries included both the loyal Mdewakanton and their families; Congress specified that the appropriated monies were to be applied on behalf of the "Indians or family thereof." Act

of Mar. 2, 1889, 25 Stat. at 992 (emphasis added).

3. The full text of the 1980 Act is quoted in Wolfchild I, 62 Fed.Cl. at 531–32. The three Indian communities are the Lower Sioux Indian Community in Minnesota, the Shakopee Mdewakanton Sioux (Dakota) Community, and the Prairie Island Indian Community in Minnesota.

4. The court determined that plaintiffs' trust claims had been preserved by the Indian Trust Accounting Statute, see the Department of the Interior and Related Agencies Appropriations Act, Pub.L. No. 108–108, 117 Stat. 1241, 1263 (Nov. 10, 2003), but that contractual claims presented by plaintiffs had not been so preserved. Wolfchild I, 62 Fed.Cl. at 547–49.

From 1990 to the present, the Indian Trust Accounting Statute has been enacted as part of the annual appropriations statute for the Department of the Interior. With minor variations, the form of the Statute has remained comparable to the version in existence at the time this action was filed on November 18, 2003:

[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub.L. No. 108–108, 117 Stat. at 1263; see Wolfchild I, 62 Fed.Cl. at 534–535 & n. 10.

This court in *Wolfchild II* also laid the groundwork for the pending party-related motions by granting plaintiffs' then-current request for authorization from the court to publish a notice informing prospective plaintiffs of the pendency of this action. 68 Fed. Cl. at 795–97. To protect the due process rights of potential plaintiffs in this case, the court ordered plaintiffs' counsel to "provide the 'best notice practicable under the circumstances, including individual notice to all [persons] who can be identified with reasonable effort.'" *Id.* at 797 (quoting Rule 23(c)(2)(B) of the Rules of the Court of Federal Claims ("RCFC"), and citing *Hoffmann–La Roche*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480, and *Quinault Allottee Ass'n and Individual Allottees v. United States*, 197 Ct.Cl. 134, 453 F.2d 1272 (1972)). In that regard, the court required that plaintiffs' counsel send notice to all known lineal descendants who were not already named as plaintiffs and otherwise to publish notice in a number of daily newspapers and periodicals, some of which had wide circulation in areas of Minnesota and others of which had extensive circulation among Native Americans. *Wolfchild II*, 68 Fed.Cl. at 797, 801–05. Moreover, acting pursuant to the "Call Statute," 28 U.S.C. § 2507, the court required the government to provide a listing of those lineal descendants known to the government. *Id.* at 797–98.

Finally, the court in *Wolfchild II* granted motions by the Shakopee Mdewakanton Sioux (Dakota) Community, the Prairie Island Indian Community, and the Lower Sioux Indian Community to file briefs as *amici curiae. See Wolfchild II*, 68 Fed.Cl. at 798–99. After enactment of the 1980 Act, the Department of the Interior had assigned the responsibility for administering the 1886 lands to these communities. In *Wolfchild II*, the court noted that given the Communities' control over and interest in the trust property, it might be necessary in the future to issue summonses to the Communities pursuant to 41 U.S.C. § 114(b). *Id.* at 799–801.[5]

A number of different issues are currently pending before the court. First, plaintiffs seek to file a Third Amended Complaint, bringing the total number of directly named plaintiffs to over 6,500. Second, in addition to the plaintiffs' motion to file a Third Amended Complaint, the court has received motions to intervene from 36 different groups of individuals, each made up of persons claiming to be a lineal descendant of a loyal Mdewakanton within the meaning of the Appropriation Acts. Third, the government has filed a motion for entry of final judgment in a related case, *Cermak v. United States*, No. 01–568L, that recently has been transferred to this court at the behest of the U.S. Court of Appeals for the Eighth Circuit, and, in that connection, at the request of the court the parties have briefed the additional issue of whether the *Cermak* case should be consolidated with *Wolfchild.* Fourth, the court must address a Motion to Intervene filed by the Lower Sioux Indian Community ("Lower Sioux Mot. to Intervene"), a community that requests that it be aligned with plaintiffs. Relatedly, the court has received a motion on behalf of two members of the Lower Sioux Indian Community, Dennis Prescott and Joseph Goodthunder, for leave to file a brief as *amici curiae* in opposition to the proposed intervention of the Lower Sioux Indian Community. Finally, plaintiffs have filed a motion for the court to issue summonses to the Shakopee and Prairie Island Communities pursuant to 41 U.S.C. § 114(b) to join them as parties in this case, as well as to issue summonses to the individual members of these Communities ("Pls.' Summons Mot."). Each of the motions associated with these issues has been fully briefed, and a hearing on all pending motions was held on July 18, 2006. The pending matters are now ready for disposition.

## ANALYSIS

### A. *Plaintiffs' Motion to File a Third Amended Complaint*

■ In *Wolfchild II*, this court sought to fulfill its responsibilities to provide notice to

---

**5.** Subsection 114(b) of Title 41 provides in part that this court "may summon any and all persons with legal capacity to be sued to appear as a party or parties in any suit ... pending in said court to assert and defend their interests, if any, in such suits or proceedings." The full text of Subsection 114(b) is quoted *infra*, at 533 (first sentence) and 37 (second sentence).

potential plaintiffs and to establish a procedure for joinder of additional parties in an orderly manner. *See Wolfchild II*, 68 Fed. Cl. at 795–98. The court required that plaintiffs' counsel, Mohrman & Kaardal, L.L.P., send personal notice of the pendency of this action to all interested lineal descendants whose identity could be established and who were not already named as plaintiffs in the then-current Second Amended Complaint, and otherwise to publish notice in a number of newspapers and periodicals. *See id.* at 804–05. The court specified a form of notice, set out as Appendix A to *Wolfchild II*, which instructed interested persons receiving notice that if they wished to join this action they could seek to be represented by plaintiffs' counsel, or alternatively, that they could select and retain another attorney to represent them. *See id.* at 803. Individuals seeking to intervene in the case were instructed to file appropriate pleadings by April 28, 2006. *Id.* That deadline was subsequently extended twice, ultimately to July 12, 2006. *See* Order of April 19, 2006; Order of June 16, 2006.

Counsel for plaintiffs caused notice to be published in accord with this court's order in *Wolfchild II*, filing affidavits of publication with the court on June 8, 2006. Plaintiffs now seek to amend their complaint to add both named and anonymous individuals who have responded to the notice by requesting joinder as plaintiffs and representation by plaintiffs' counsel. *See* Plaintiffs' Revised Motion to Amend ("Pls.' Mot. to Amend") submitted on July 18, 2006, seeking leave to file a Third Amended Complaint. Plaintiffs' counsel represents that the proffered Third Amended Complaint names 6,553 individuals, including 219 anonymous plaintiffs, each of whom alleges that he or she is a lineal descendant of a loyal Mdewakanton. Hr'g. Tr. 90:2–18 (July 18, 2006). During the hearing, the government indicated that it did not object to plaintiffs' motion to file the proposed Third Amended Complaint on the understanding that it did not change the substance of plaintiffs' allegations. *Id.* 22:19 to 23:4.

In this case, the court has jurisdiction over the lineal descendants of the loyal Mdewakanton as an "identifiable group of American Indians" within the meaning of the Indian Tucker Act, 28 U.S.C. § 1505. Previously, the government objected to the right of the lineal descendants to sue as a collective group because the descendants were " 'not a tribal group.' " *Wolfchild I*, 62 Fed.Cl. at 539 (quoting Defendant's Mot. to Dismiss at 12). This court rejected that argument on the grounds that (1) the "plaintiffs need not be an organized unit to claim jurisdiction under the Indian Tucker Act," *id.* (citing *Tee–Hit–Ton Indians v. United States*, 128 Ct.Cl. 82, 120 F.Supp. 202, 204 (1954)), and (2) the government's allegation that the 1980 Act divested the lineal descendants of rights, an allegation the court found to be invalid as a matter of law, but which, even if accepted, "d[id] not elide any jurisdiction that would arise under the Indian Tucker Act." *Id.* (citing *Menominee Tribe v. United States*, 179 Ct.Cl. 496, 388 F.2d 998, 1001 (1967)). Additionally, the court refused to credit the government's reliance on a correlative argument that individual Indians are not permitted to bring personal claims under the Indian Tucker Act. *Id.* at 539–40. The court held that the lineal descendants were seeking to vindicate a collective claim inhering in the group, not particular, personal claims discrete to each individual. *Id.* at 540 (distinguishing *Cherokee Freedmen v. United States*, 161 Ct.Cl. 787, 1963 WL 8556 (1963)). The government does not renew these contentions at this juncture, and the court adheres to its prior ruling in *Wolfchild I* that this case involves a collective claim. Joinder of additional members of the group as plaintiffs in an amended complaint is thus proper under the Indian Tucker Act. *Id.* at 539–40.

■ Moreover, joinder of plaintiffs in this case would be proper even if this were not a "group" claim under the Indian Tucker Act. Ordinarily, the rule governing whether to allow the additional individuals to join as plaintiffs is RCFC 20(a), which provides that "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." Individual plaintiffs must satisfy the requirements of this Rule.

Here, all of the plaintiffs jointly assert claims for breach of the same fiduciary duty under the trust created by the 1888, 1889, and 1890 Appropriations Acts, alleging that they are lineal descendants of loyal Mdewakanton within the meaning of those Acts. Proposed Third Am. Compl. ¶¶ 1–2. In their complaint, the plaintiffs claim to sue as individuals "on behalf of themselves." *Id.* ¶ 5. The court construes this language to mean that the named plaintiffs are asserting their claims jointly and severally.[6] Thus, all of the prospective plaintiffs would be joining previously named plaintiffs in asserting a right to relief jointly and severally. The plaintiffs' relationship thus satisfies the first element of Rule 20(a). Additionally, in this case there are questions of law and fact common to all plaintiffs. Indeed, this commonality requirement "is usually easily satisfied, particularly since there must be only one such overlapping question." *Wolfchild I*, 62 Fed.Cl. at 552 (citing *Franconia Assocs. v. United States*, 61 Fed.Cl. 335, 336 (2004)). Here, however, all or most of the legal issues would be common to the plaintiffs, as would many of the factual issues.

In sum, permissive joinder of additional lineal descendants of the loyal Mdewakanton is proper under either the Indian Tucker Act or RCFC 20(a), and, accordingly, plaintiffs are granted leave to file the proposed Third Amended Complaint to add such plaintiffs.[7]

### B. Motions to Intervene as Plaintiffs

■ The court has received motions to intervene as plaintiffs from 36 different groups of individuals claiming to be descendants of the Loyal Mdewakanton.[8] Some of these groups of individuals base their claims upon the census of loyal Mdewakanton conducted by U.S. Special Agent Walter McLeod between May 20, 1886 and September 2, 1886, *see Wolfchild I*, 62 Fed.Cl. at 528, as supplemented by a subsequent census taken in 1889 by Robert B. Henton, Special Agent for the Bureau of Indian Affairs. *Id.* Others seek to establish their status as lineal descendants based upon different forms of proof. Some groups of applicants for intervention contain individuals from both categories, *i.e.*, applicants who claim to be descendants of persons listed on the 1886 and 1889 censuses, and other applicants who seek to prove that they are lineal descendants of loyal Mdewakanton not listed on the 1886 census or 1889 supplement.

Those groups of individuals seeking to intervene as plaintiffs are as follows:

| Group Name | Number of Applicants | Filing Date | Basis for Descendancy | |
|---|---|---|---|---|
| | | | 1886 & 1889 Censuses | Other Source |
| Mozak | 808 | 6/21/2006 (amended on 7/13/06 and 7/17/06) | X | |
| Rooney | 27 | 6/27/2006 | | X |
| Anonymous Walker | 37 | 6/25/2006; 7/10/2006 (mot. to withdraw 1 applicant) | | X |

6. Plaintiffs describe themselves as members of the group consisting of themselves and "all other descendants listed on the May 20, 1886 U.S. Mdewakanton census." Proposed Third Am. Compl. ¶ 5. Plaintiffs have declined to seek class certification although they made class allegations. *See, e.g., Wolfchild II*, 68 Fed.Cl. at 795–96 (citing Second Am. Compl. at 50–51).

7. The court in *Wolfchild I* determined that in the circumstances of this case, it is appropriate for certain plaintiffs to file anonymously because of the very real prospect of reprisals. *See* 62 Fed. Cl. at 552–54. For this same reason, it is permissible for plaintiffs to add additional anonymous plaintiffs in their Third Amended Complaint.

8. The 36 different groups whose motions are addressed in this section include groups headed by Jesse Cermak and Raymond Cermak, Sr., the named plaintiffs in *Cermak v. United States*, No. 01–158C. The motions respecting the *Cermak* case are addressed *infra*, at 13–21.

The motion to intervene filed by the Lower Sioux Indian Community has been separately considered because it raises different issues. *See infra*, at 21–18.

| | | | | |
|---|---|---|---|---|
| Rocque | 151 | 6/29/2006 (amended 7/13/06) | X | |
| Blaeser | 6 | 7/17/2006 | X | |
| Lowe | 238 | 7/17/2006 | X | |
| Whipple | 107 | 7/17/2006 | X | |
| Lafferty | 547 | 7/17/2006 | X | |
| Ke Zephier | 827 | 7/17/2006 | X | |
| Garreau (Hall) | 137 | 7/13/2006 | X | |
| Trudell | 432 | 7/13/2006 | X | |
| Saul | 90 | 6/23/2006 | X | |
| Ferris | 274 | 7/13/2006 | X | |
| Taylor | 85 | 7/13/2006 | X | |
| Henry | 505 | 7/13/2006 | X | |
| Vassar | 84 | 7/17/2006 | X | |
| French | 33 | 7/13/2006 | X | |
| Wanna | 524 | 7/13/2006 | X | |
| Cournoyer | 826 | 7/17/2006 | X | |
| Enyard | 259 | 6/26/2006 (217 applicants); 7/17/2006 (mot. to add 38 applicants); 7/31/06 (mot. to add 4 applicants) | X | |
| Burley | 32 | 6/27/2006 | | X |
| DuMarce | 2,658 | 7/17/2006; 8/2/2006 (mot. to amend to add 356 adult and 353 minor plaintiffs) | | X |
| Kimbell | 248 | 7/17/2006 | | X |
| Robinette | 221 | 7/17/2006 | | X |
| Abrahamson | 396 | 7/17/2006 | | X |
| Zephier | 178 | 6/29/2006 | | X |
| J. Cermak | 54 | 3/31/2006 | | X |
| R. Cermak, Sr. | 14 | 4/13/2006 | | X |
| Klingberg | 22 | 6/20/2006 | X | X |
| Alkire | 35 | 6/26/2006 | X | X |
| Arnold | 11 | 6/26/2006 | X | X |
| Henderson | 31 | 6/16/2006 | X | X |
| Stephens | 58 | 6/26/2006 | | X |
| Anonymous Blair | 433 | 7/17/2006 | X | X |
| Godoy | 762 | 7/20/2006 | X | X |
| Felix | 340 [9] | 6/9/2006 | X | X |

9. The lead party in this group is Ms. Frances Elaine Felix, who is not a lawyer. Ms. Felix has filed a motion to intervene on behalf of herself and approximately 340 other members of her family, who are not themselves named. A plaintiff may appear *pro se* without being represented by counsel, and such a *pro se* plaintiff may also represent family members. *See* RCFC 83.1(c)(8) ("An individual may represent oneself or a member of one's *immediate* family as a party before the court.") (emphasis added). For purposes of the pending motion to intervene by the Felix group, the court has allowed Ms. Felix to represent her family generally, but, as the case progresses, the court will require Ms. Felix to identify those persons who are members of her "immedi-

RCFC 24 governs intervention.[10] As a general matter, "the requirements for intervention are to be construed in favor of intervention." *American Maritime Transp., Inc. v. United States,* 870 F.2d 1559, 1561 (Fed. Cir.1989) (citing *Westlands Water Dist. v. United States,* 700 F.2d 561, 563 (9th Cir. 1983)). Nonetheless, "[i]ntervention is proper only to protect those interests which are 'of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment.'" *American Maritime Transp.,* 870 F.2d at 1561 (quoting *United States v. American Telephone & Telegraph Co.,* 642 F.2d 1285, 1292 (D.C.Cir.1980)) (emphasis in original).[11] Each applicant claims a direct and immediate interest in the subject of this action, *i.e.,* the trust created by the Appropriations Acts of 1888, 1889, and 1890. Moreover, those groups of applicants for intervention that assert means of proving descendancy different from the 1886 and 1889 censuses all make good-faith, non-frivolous

claims that they are beneficiaries of the trust under the criteria specified in the Appropriation Acts. Additionally, the disposition of this action may affect each applicant's ability to protect his or her claimed interest, as any judgment in this case could affect future vindication of that claimed interest. The applications are timely, and each applicant has a separate responsibility to establish that he or she is a member of the group of lineal descendants and cannot rely on others to make that showing. It is therefore appropriate to grant intervention as of right to each of these applicants for intervention. The motions to intervene on behalf of all 36 groups of applicants for intervention are granted.[12]

Although they do not oppose intervention, plaintiffs request that the court limit the individual intervenors' involvement in future proceedings regarding a motion plaintiffs filed for partial summary judgment, which motion the court has temporarily stayed,[13]

ate family" and those who are members of her extended family. In due course, those persons in the latter group will have to be represented by counsel admitted to the bar of this court.

10. RCFC 24 in pertinent part, provides:
(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
(b)Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

11. *American Maritime Transport* interpreted Claims Court Rule 24(a), relying upon cases interpreting Fed.R.Civ.P. 24(a), which was "virtually identical" to Claims Court Rule 24(a). 870 F.2d at 1560 & n. 4. RCFC 24(a) also is *in pari materia* with Fed.R.Civ.P. 24(a).
Under RCFC 24(a), as construed in *American Maritime Transport,* with relation to each applicant for intervention, the court considers (1) the timeliness of the motion; (2) whether the appli-

cant claims an interest relating to the property or transaction that is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties. *American Maritime Transp.,* 870 F.2d at 1560; *see also Honeywell Int'l, Inc. v. United States,* 71 Fed.Cl. 759, 761–62 (2006); *Klamath Irrigation Dist. v. United States,* 64 Fed. Cl. 328, 330–33 (2005).

12. Granting these motions to intervene would also be appropriate under RCFC 24(b). The prospective plaintiffs and the current plaintiffs are jointly asserting claims for breach of the same fiduciary duty. The principal questions of law and many of the questions of fact are common to all of the plaintiffs and applicants for intervention. The separate issues of fact concern proofs of descent from a loyal Mdewakanton, and those intervening plaintiffs who do not rely upon inclusion of an ancestor in the 1886 census or 1889 supplement will also be required to carry the burden of establishing the mixed question of fact and law associated with proof of another means of showing that an ancestor was a loyal Mdewakanton.

13. Concurrently with the submission of the numerous pending motions respecting parties, plaintiffs filed motions for partial summary judgment, seeking rulings that (1) the government "additionally ... breached its fiduciary duties by failing to collect and disburse funds from govern-

and further request that the court require intervenors who do not base their trust beneficiary claims on the 1886 census and 1889 supplement to demonstrate to the court their trust beneficiary status at the same time the court considers plaintiffs' stayed partial summary judgment motions. *See* Pls.' Response to Mot. to Intervene at 3 (filed July 17, 2006). The court does not accept plaintiffs' proposed limitations on the participation of intervenors. With the grant of their motions to intervene, the intervening plaintiffs will be parties to this case for all purposes and entitled to participate fully in all future proceedings. Plaintiffs' stayed motions for partial summary judgment have not advanced to the point that inclusion of intervenors in the consideration of that motion will unduly delay disposition of the motions or the ultimate resolution of this action.

### C. *The* Cermak *Case*

Pending before the court in *Cermak v. United States,* No. 01–568L, is Defendant's Motion for Entry of Final Judgment, filed on April 14, 2006. The *Cermak* case has a convoluted procedural history and is now before the court on a transfer ordered by the U.S. Court of Appeals for the Eighth Circuit. The *Cermak* case is also interwoven with *Wolfchild.* The two plaintiffs in *Cermak,* Stanley F. Cermak, Sr., and Raymond Cermak, Sr., are movants for intervention in the *Wolfchild* case. *See supra,* at 518–19. The *Cermak* case originally was filed in the District Court for the District of Minnesota in 1998. The claims alleged by plaintiffs in *Cermak* involve parcels of the trust property at issue in *Wolfchild.* Among other things, plaintiffs in *Cermak* claim entitlement to the use of, and proceeds derived from, the particular parcels. The *Cermak* case was before this court on one prior occasion. In 2002, after the case had first been transferred here from the District Court for the District of

Minnesota, a judge of this court granted the government's motion to dismiss certain claims of the *Cermak* plaintiffs, and the government now seeks entry of final judgment with respect to those claims.

In effect, as will appear from the discussion that follows, the *Cermak* case has been split into two cases, one currently pending before the Eighth Circuit on appeal from a judgment of the District Court for the District of Minnesota and the other pending before this court. In the *Cermak* case over which this court has jurisdiction, for the reasons set out below, this court enters final judgment on two of the claims of the *Cermak* plaintiffs. However, it denies entry of final judgment under RCFC 54(b) on the third of the *Cermak* claims, grants reconsideration of a prior ruling on that latter claim, and orders that the *Cermak* case insofar as that claim is concerned be consolidated with *Wolfchild* for further proceedings.

### 1. *Background and procedural history of the* Cermak *case.*

In 1944, John Cermak received from the U.S. Department of the Interior Indian Land Certificates 64 and 65 that assigned tracts of the 1886 lands to him. *See Cermak v. Norton,* 322 F.Supp.2d 1009, 1011 (D.Minn.2004). The land described on the Certificates thus constituted part of the trust property at issue in *Wolfchild. See Wolfchild I,* 62 Fed.Cl. 521, 541–43 (2004); Plaintiff's Second Amended Complaint in *Cermak* ("Second Amd. Compl."), ¶ 2; Hr'g Tr. 84:21–23 (July 18, 2006), 88:17–23. Certificates 64 and 65 declared that

> John Cermak and his heirs are entitled to immediate possession of said land, which is to be held in trust by the Secretary of the Interior, for the exclusive use and benefit of said Indian, so long as said allottee or his or her heirs occupy and use said land.

---

ment trust accounts set aside for the lineal descendants of the Loyal Mdewakanton—including the $61,725.52 that the United States has admittedly failed to disburse since at least 1975;" and (2) "the government ... additionally breached its fiduciary duties to the lineal descendants by approving the 1969 Shakopee ... Base Roll and ... the Shakopee Constitution in 1969 with 1/4 blood quantum and vote-in restrictions." Plaintiffs' Motions ... For Partial Summary Judgment

at 1 (filed Mar. 6, 2006). The government moved to stay proceedings on those motions, and the court granted the requested stay, ordering that "[b]riefing of plaintiffs' motions for partial summary judgment will be stayed until disposition of the pending motion to issue summonses to communities and the deadline by which an individual must move to join as plaintiff as stated in this court's Opinion and Order of December 16, 2005." Order of March 20, 2006.

Second Amd. Compl. in *Cermak*, ¶ 10. John Cermak lived on the assigned land until his death in 1989, and his will bequeathed all of his interests in the land assignments to his son, Edward Cermak. *Id.; Cermak v. Norton*, 322 F.Supp.2d at 1011. Prior to the 1980 Act, it was common practice, although not guaranteed, for a land certificate to be assigned to a child of the deceased holder at the holder's death. *Wolfchild*, 62 Fed.Cl. at 528–29. In 1989, Edward Cermak formally requested that the Bureau of Indian Affairs ("BIA") probate his father's will. *Cermak v. Norton*, 322 F.Supp.2d at 1011. The BIA refused, stating that it lacked jurisdiction to probate the will because the 1980 Act placed ownership of the land in trust for the benefit of the Shakopee Mdewakanton Sioux Community of Minnesota ("Shakopee Community"). *Id.; see Brewer v. Acting Assistant Sec'y of the Interior*, 10 I.B.I.A. 110, 116–19 (1982); *Gitchel v. Acting Minneapolis Area Dir.*, 28 I.B.I.A. 46 (1995); *Cermak v. Acting Minneapolis Area Dir.*, 32 I.B.I.A. 77, 78 (1998).

Edward Cermak died in 1992. The conservator for the descendants of Edward Cermak sought possession of the land formerly covered by the Certificates. *Cermak v. Norton*, 322 F.Supp.2d at 1011. BIA again refused, reiterating its view that the Certificates had conveyed only a life interest to John Cermak. *Id.* That decision was appealed to the Interior Board of Indian Appeals ("IBIA") by certain descendants of John Cermak, in a matter styled *Gitchel v. Minneapolis Area Director*, I.B.I.A. 94–161–A. However, the plaintiffs in *Cermak*, Raymond Cermak and Stanley Cermak, did not participate in the *Gitchel* action. *See Cermak v. Norton*, 322 F.Supp.2d at 1011. In June 1995, the IBIA denied the appeal, holding that the Certificates issued to John Cermak did not convey an inheritable interest. *Gitchel*, 28 I.B.I.A. at 48. The IBIA went on to observe that "BIA's pre–1980 administrative practice" of according heirs a reassignment priority "[wa]s no longer applicable.... Rather, it is Community law and practice which now controls the use of this property." *Id.* at 49.

In 1996, plaintiff Raymond Cermak, Sr., son of Edward Cermak, requested that the area director of the BIA reissue the certificates and grant possession to him and other members of the Cermak family. *Cermak v. Norton*, 322 F.Supp.2d at 1011–12. The BIA refused, and Raymond Cermak appealed the decision to the IBIA. *See Cermak v. Acting Minneapolis Area Dir.*, 32 I.B.I.A. at 77. The IBIA dismissed the action, finding that Raymond Cermak lacked standing to bring the appeal. *See Cermak v. Acting Minneapolis Area Dir.*, 32 I.B.I.A. at 79. The IBIA further found that the ultimate issue had already been decided in the *Gitchel* action, which held that John Cermak held only a life interest in the lands, which terminated upon his death. *See Cermak v. Norton*, 322 F.Supp.2d at 1012 (citing *Cermak v. Acting Minneapolis Area Dir.*, 32 I.B.I.A. at 78). The IBIA held that the *Gitchel* decision was *res judicata* as to Raymond Cermak's claims. *Cermak v. Norton*, 322 F.Supp.2d at 1012 (citing *Cermak v. Acting Minneapolis Area Dir.*, 32 I.B.I.A. at 78–80).

In April 1998, the *Cermak* plaintiffs initiated this lawsuit in the District Court for the District of Minnesota ("district court"), alleging "breach of trust" and a "taking" of property. Def.'s Mot. for Entry of Final Judgment at 2. The "breach of trust" claim can be construed as two separate claims. The first of these claims, the main thrust of the plaintiffs' original complaint, was that the government had a duty to assign the land certificates to the heirs of John Cermak and failed to do so. Plaintiffs have referred to this claim as a "breach of trust" claim, but it is really more akin to a breach of legal duty, *see* Order, *Cermak v. United States*, No. 01–568C (Fed.Cl. Sept. 3, 2002), at 5; consequently, this claim will be described as a "breach of legal duty" to avoid confusion with the Cermaks' other claims. The second aspect of the Cermaks' original "breach of trust" claim could be construed as a trust-mismanagement claim, one which remained in part inchoate until the Second Amended Complaint was filed in this court in April 2006. The plaintiffs also alleged a taking of the Cermaks' alleged inherited property rights pursuant to the Fifth Amendment of

the Constitution. Def.'s Mot. for Entry of Final Judgment at 2.[14]

On July 12, 1999, the district court determined that it lacked subject matter jurisdiction to hear the Cermaks' claims and transferred the case to this court pursuant to 28 U.S.C. § 1631. Order, *Cermak v. Babbitt*, 1999 WL 33912057 (D.Minn. July 12, 1999). The U.S. Court of Appeals for the Federal Circuit upheld the transfer to this court. *Cermak v. Babbitt*, 234 F.3d 1356, 1364 (Fed. Cir.2000). After transfer to this court, the then-assigned judge ruled that the expiration of the applicable statute of limitations barred consideration of the Cermaks' alleged takings and "breach of trust" claims pursuant to 28 U.S.C. § 2501 (specifying a six-year limitation period). Order, *Cermak v. United States* (Fed.Cl. Sept. 3, 2002) at 4.[15] Accordingly, the takings and "breach of trust" claims were dismissed and the case was transferred back to the district court for a determination whether there were any potential claims pursuant to the Administrative Procedure Act ("APA"), claims as to which the district court would have federal question jurisdiction pursuant to 28 U.S.C. § 1331. *Id.* at 7; *see* 5 U.S.C. §§ 701–706.

The Cermaks filed an amended complaint with the district court setting out an explicit APA claim seeking to overturn IBIA's determination respecting heirship and reassignment of the certificates, essentially restating their former takings and breach of duty claims. *Cermak*, 322 F.Supp.2d at 1012–13. The district court granted summary judgment denying the APA claim and entered final judgment on all of the Cermaks' other claims, even those respecting which it acknowledged it did not have jurisdiction. *Id.* at 1016. The Cermaks appealed, and the government moved to dismiss the appeal without prejudice, requesting that the Court of Appeals for the Eighth Circuit remand to the district court for entry of a judgment only as to the APA claim plus an order that the Cermaks' other claims again be transferred to the Court of Federal Claims. Def.'s Mot. for Entry of Final Judgment at 6. The Eighth Circuit so remanded the case. Subsequently, the district court entered judgment on the Cermaks' APA claims on January 3, 2006, and the Cermaks appealed on March 2, 2006. *Id.* The APA claim remains pending before the Eighth Circuit on appeal. *Id.;* Hr'g Tr. 79:22 to 80:16 (July 18, 2006).

This court received the *Cermak* case by retransfer on March 30, 2006, and the Cermaks subsequently filed a Second Amended Complaint in this court on April 27, 2006. The Second Amended Complaint effectively re-states plaintiffs' original causes of action. First, the *Cermak* plaintiffs allege that the government breached a duty to convey the interest in the two land parcels to the plaintiffs (the "breach of legal duty" claim), *see* Second Am. Compl. ¶¶ 27–29, 32. Secondly, the plaintiffs reiterate their claim that the government took their property by refusing to "allow[ ] the land to descend to the legitimate heirs of John Cermak." *Id.* ¶¶ 37–38. The Cermaks thirdly set forth an additional and distinct claim, alleging that the government "did not distribute ... any share which should have been distributed to [the Cermak plaintiffs] as descendants of the Friendly Sioux, entitled to the distribution of a pro rata share of the trust corpus and/or revenue." Second Am. Compl. ¶ 26.

### 2. *Reconsideration of the decision rendered September 3, 2002.*

The judge of this court previously assigned to the case dismissed the Cermaks' takings claim in 2002 because he determined that the expiration of a statute of limitations barred the court from considering that claim. Order, *Cermak v. United States*, No. 01–568C (Fed.Cl. Sept. 3, 2002), at 4–5. He dismissed the breach of duty claim on the

---

14. This takings claim had its foundation in the Supreme Court's decisions in *Hodel v. Irving*, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (provision of Indian Land Consolidation Act providing for escheat of small fractional interests in land was unconstitutional because it effected a taking of descendent's properties without compensation), and *Babbitt v. Youpee*, 519 U.S. 234,

117 S.Ct. 727, 136 L.Ed.2d 696 (1997) (amendment to escheat provision of Indian Land Conservation Act did not cure constitutional defect).

15. Under 28 U.S.C. § 2501, a plaintiff has up to six years to file a claim in this court after the claim has accrued against the government.

ground that plaintiffs had failed to identify any money-mandating obligation to support that claim. *Id.* at 6. The court now reconsiders whether these dismissals were appropriate. The Order of September 3, 2002 was an interlocutory order, not a final judgment. *See Cermak v. Norton,* 322 F.Supp.2d at 1012.[16] Therefore, the law of the case doctrine governs this court's reconsideration of the takings and breach of trust claims, not the rules that apply to reconsideration of final judgments.[17] "Courts possess inherent power to modify their interlocutory orders before entering a final judgment." *Florida Power & Light v. United States,* 66 Fed.Cl. 93, 96 (2005) (citing *Balla v. Idaho State Bd. of Corrs.,* 869 F.2d 461 (9th Cir.1989); *John Simmons Co. v. Grier Bros. Co.,* 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475 (1922)); *see also Klamath,* 69 Fed.Cl. at 161; *Wolfchild II,* 68 Fed.Cl. at 784–85; RCFC 54(b).[18] " 'The law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts.' " *Gould, Inc. v. United States,* 67 F.3d 925, 930 (Fed. Cir.1995) (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 839 F.2d 1544, 1550 (Fed. Cir.1988), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020 (Fed.Cir.1992)); *see United States v. U.S. Smelting Refining & Mining Co.,* 339 U.S. 186, 198–99, 70 S.Ct. 537, 94 L.Ed. 750 (1950). The law of the case doctrine protects the parties' settled expectations and enables cases to develop in an orderly manner. *Independence Park Apts. v. United States,* 61 Fed.Cl. 692, 699 (2004) (quoting *Suel v. Sec'y of Health & Human Servs.,* 192 F.3d 981, 984 (Fed.Cir.1999)),

*rev'd on other grounds,* 449 F.3d 1235 (Fed. Cir.2006).

▐ In general, the law of the case doctrine permits a court to "reconsider its decisions until a judgment is entered," *Florida Power & Light,* 66 Fed.Cl. at 95, 98 (quoting *Exxon Corp. v. United States,* 931 F.2d 874, 877 (Fed.Cir.1991)); *see U.S. Smelting,* 339 U.S. at 198–99, 70 S.Ct. 537, and to change "incorrect legal conclusion[s]." *Florida Power & Light,* 66 Fed.Cl. at 98. Courts may forsake prior determinations when (1) new and different evidence is discovered, (2) there is a contradictory ruling by controlling authority, or (3) the prior determination was "clearly incorrect" and "preservation [of the prior ruling] would work a manifest injustice." *Intergraph Corp. v. Intel Corp.,* 253 F.3d 695, 698 (Fed.Cir.2001) (citing *Smith Int'l, Inc. v. Hughes Tool Co.,* 759 F.2d 1572, 1576 (Fed.Cir.1985)).

In this instance, the court properly dismissed the Cermaks' alleged takings claim in 2002 because the applicable statute of limitations had expired. The alleged takings claim accrued no later than 1990, when BIA cancelled Certificates 64 and 65, and the Cermaks originally filed their lawsuit in 1998, well beyond the six-year limitation specified in 28 U.S.C. § 2501. Furthermore, the BIA and the IBIA ruled that a certificate issued to a lineal descendant of a loyal Mdewakanton granted restricted and refutable use rights to the holder but did not convey an heirship right. *See Wolfchild,* 62 Fed.Cl. at 528–29, 541–43; *Brewer,* 10 I.B.I.A. at 116–19; *Gitchel,* 28 I.B.I.A. at 48. Absent an inheritable property right in favor of the plaintiffs, there could have been no taking when the government cancelled the Certificates issued to John Cermak.

---

**16.** RCFC 54(a) defines a final judgment as a "decree and any order from which an appeal lies." *See Klamath Irrigation Dist. v. United States,* 69 Fed.Cl. 160, 161 (2005).

**17.** RCFC 59(a)(1) provides, in relevant part, that:

A new trial or rehearing or reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States.

**18.** RCFC 54(b) provides in pertinent part that, absent an order directing a final judgment as to a part of the claims or as to some but not all of the parties—

any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

With respect to the *Cermak* plaintiffs' claim for breach of legal duty (referred to originally as a "breach of trust" claim by the Cermaks), the government did not breach a legally cognizable duty by refusing to assign the Certificates to Raymond and Stanley Cermak because no such duty existed. *See Gitchel*, 28 I.B.I.A. at 48; *Brewer*, 10 I.B.I.A. at 116–19; *see also Wolfchild I*, 62 Fed.Cl. at 528–29. The custom of assigning a certificate to a deceased holder's heirs was not always followed and was not guaranteed because the BIA treated the certificates as only conveying a right to use the land, subject to significant restrictions. *See Wolfchild I*, 62 Fed.Cl. at 528–29; *Wolfchild II*, 68 Fed.Cl. at 791 (citing Def.'s Recons. Mot. Ex. 17 (Memorandum from Assistant Commissioner Merritt, with approval of Bo Sweeney, Assistant Secretary of the Interior, to Secretary of the Interior (Apr. 2, 1915), at 1) (concluding that Certificates conveyed and represented "merely 'tenancies at will' and, as such, [were] not inheritable.")). Moreover, the Department of the Interior as trustee had discretion over the assignment of trust lands that had been assigned to a deceased certificate holder. *See Wolfchild I*, 62 Fed.Cl. at 528–29; *see also Brewer*, 10 I.B.I.A. at 116–19. That discretion was limited in the sense that a certificate of assignment could be issued only to a lineal descendant of loyal Mdewakanton. Otherwise, the Department of the Interior had discretion that could be exercised in a reasonable, non-abusive manner. Accordingly, the dismissal of the plaintiffs' claims of breach of legal duty in *Cermak* related to the government's refusal to assign certificates to the heirs of John Cermak was appropriate.

In addition, the Cermaks' "breach of legal duty" claim in significant measure challenges the decisions of the IBIA in *Gitchel* and *Cermak*, as the previously assigned judge in this court and the district court noted. Any such challenge would properly be brought as a claim under the APA. *See* 5 U.S.C. §§ 701–706. Federal district courts have exclusive original jurisdiction over any APA claims for reviewing an agency's actions. *See* 5 U.S.C. §§ 701–706; *Sharon v. United States*, 802 F.2d 1467, 1467–68 (D.C.Cir.1986); *Runs After v. United States*, 766 F.2d 347, 351 (8th Cir.1985); *McNabb v. United States*, 54 Fed. Cl. 759, 766–67 (2002); *Cermak v. Norton*, 322 F.Supp.2d at 1014. Insofar as the breach of legal duty claim arose under the APA, it was properly before the district court and is now before the Eighth Circuit on appeal, and this court has no jurisdiction over it.

One further aspect of the decision to dismiss the "breach of trust" claim deserves close scrutiny. In the Order of September 3, 2002, the court stated that it "[could] not consider [plaintiffs'] ... breach of trust claims because the statute of limitations expired." Order, *Cermak v. United States*, No. 01–568C (Fed.Cl. Sept. 3, 2002), at 1. Taken at face value, this ruling indicated that the court could not consider *any* breach of trust claim by the Cermak plaintiffs, including a trust-mismanagement claim. The court did not address the possibility that plaintiffs were beneficiaries of a trust arising under the 1888, 1889, and 1890 Appropriation Acts or that the government may have breached ensuing trust responsibilities to the *Cermak* plaintiffs when the government determined that the Cermaks would no longer be entitled to the use or benefit of the trust properties. In this connection, the Indian Trust Accounting Statute resurrects and preserves claims for "losses to or mismanagement of trust funds" by suspending the running of the statute of limitations until the government provides an accounting to beneficiaries. *Wolfchild I*, 62 Fed.Cl. at 547–49; *see Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1346–50 (Fed.Cir.2004). There has been no accounting with respect to the trust property. Thus, the Indian Trust Accounting Statute preserves the Cermaks' claims for an alleged breach of the trust arising out of the 1888, 1889, and 1890 Appropriation Acts. This trust-mismanagement claim by the Cermaks matches the plaintiffs' claims in *Wolfchild*, which also are preserved by the Indian Trust Accounting Statute and are not subject to 28 U.S.C. § 2501. *See Wolfchild I*, 62 Fed.Cl. at 547–49.

The Indian Trust Accounting Statute was not considered in relation to the order entered in 2002 dismissing the plaintiffs'

breach of trust claims in *Cermak.* Thus, the order in 2002 dismissing the trust claim based on the statute of limitations was based on "clearly incorrect" grounds because it did not consider the Indian Trust Accounting Statute, and adherence to the order would produce "manifest injustice" by barring the Cermaks from asserting a potentially valid Indian trust claim. *Intergraph Corp.,* 253 F.3d at 698 (citing *Smith Int'l,* 759 F.2d at 1576). Thus, on reconsideration the court vacates the order entered in 2002 insofar as it dismisses the Cermak's trust-mismanagement claim. That claim is reinstated.

Accordingly, the government's motion for entry of final judgment in *Cermak* is granted in part and denied in part. The motion is granted insofar as the Cermaks' takings and non-APA breach of legal duty claims are concerned. It is denied as to the trust-mismanagement claim. To provide for entry of a fully effective judgment in these circumstances, the court will act under RCFC 54(b) to cause a final judgment to be entered as to the claims in *Cermak* as to which dismissal is being upheld. The question then arises how best to integrate the Cermaks' trust-mismanagement claim into proceedings in the *Wolfchild* case where matching claims are at issue.

### 3. *Consolidation.*

 Procedurally, the simplest and most straightforward way to integrate the Cermaks' trust mismanagement claims into those pending in Wolfchild would be to consolidate that part of the *Cermak* case with *Wolfchild.* Consolidation is governed by RCFC 42, which provides in part that:

> [w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delays.

RCFC 42(a). Courts exercise "broad discretion" when considering consolidation. *Cienega Gardens v. United States,* 62 Fed.Cl. 28, 32 (2004) (citing *Johnson v. Celotex Corp.,*

899 F.2d 1281, 1284 (2d Cir.1990); *Skirvin v. Mesta,* 141 F.2d 668, 672–73 (10th Cir.1944)). *See Morse Diesel Int'l, Inc. v. United States,* 66 Fed.Cl. 801, 804 (2005) (citing *Joseph Morton Co. v. United States,* 757 F.2d 1273, 1280 (Fed.Cir.1985)). "A [trial] court can consolidate related cases under Federal Rule of Civil Procedure 42(a) *sua sponte.*" *Devlin v. Transportation Commc'ns Int'l Union,* 175 F.3d 121, 130 (2d Cir.1999) (citing *In re Adams Apple, Inc.,* 829 F.2d 1484, 1487 (9th Cir.1987)).[19] Consolidation is encouraged if it "strongly advance[s]" a court's interest in judicial economy. *Cienega Gardens,* 62 Fed. Cl. at 33. "In determining whether consolidation is appropriate, the court must weigh the risks of prejudice and possible confusion against 'the risk of inconsistent adjudication of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.'" *Boston Edison Co. v. United States,* 67 Fed.Cl. 63, 65–66 (2005) (quoting *Cienega Gardens,* 62 Fed.Cl. at 31; *Johnson,* 899 F.2d at 1285; *Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186, 193 (4th Cir.1982)); *see also Manhattan Constr. Co. v. United States,* 66 Fed.Cl. 299 (2005); *Karuk Tribe of Cal. v. United States,* 27 Fed.Cl. 429, 433 (1993).

Consolidating the Cermaks' trust mismanagement claim with *Wolfchild* would increase judicial efficiency. Both cases have similar questions of law and fact; *Cermak* and *Wolfchild* involve the corpus of the trust arising under the Appropriation Acts, and the trust claimants in the two cases must address many of the same factual issues, including whether they are trust beneficiaries, namely, lineal descendants of the loyal Mdewakanton. Any confusion produced by adding the *Cermak* plaintiffs to the extraordinarily lengthy list of *Wolfchild* plaintiffs should be minimal, particularly because the *Cermak* plaintiffs are also members of a group of applicants for intervention.

The court requested that the parties brief the issue whether *Cermak* should be consoli-

---

**19.** Fed.R.Civ.P. 42(a) is for all practical purposes identical to RCFC 42(a).

dated with *Wolfchild. See* Order of April 19, 2006. A court considers the positions of the parties regarding consolidation but does not give those positions dispositive weight; in fact, consolidation may be ordered in the face of party opposition. *Cienega Gardens,* 62 Fed.Cl. at 32 (citing *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.,* 712 F.2d 978, 989 (5th Cir.1983)). The *Cermak* plaintiffs have filed a motion to intervene in *Wolfchild,* indicating some willingness to consolidate. The current plaintiffs in *Wolfchild* are opposed to consolidation "because the proposed intervenors lack standing and their claims lack merit;" the plaintiffs in *Wolfchild* contend that the Cermaks are not lineal descendants of loyal Mdewakanton. Pls.' Resp. to Three Motions to Intervene by the Descendants of Angelene and Amos Morand at 10. The court, however, has not yet embarked on the process of evaluating the merits of parties' claims to be lineal descendants; parties that make good-faith, nonfrivolous claims to be lineal descendants are entitled to state causes of action. The *Cermak* plaintiffs meet this threshold. Finally, the government asserts that the *Cermak* plaintiffs allege a different claim from that of the *Wolfchild* plaintiffs. Def.'s Reply Mem. in Support of Final Judgment at 3; Hr'g Tr. 27:22 to 28:1. This assertion ignores the trust-mismanagement claim set out in the Cermaks' Second Amended Complaint. Moreover, this assertion, even if it were to be true, would not be a bar to consolidation because identical claims are not required for consolidation. *See Mylan Pharms., Inc. v. Henney,* 94 F.Supp.2d 36, 44 (D.D.C.2000) ("The plaintiffs' requests for different forms of relief do not vitiate the propriety of consolidation, but rather, consolidation is proper to any or all matters in issue which are common") (citations omitted), *rev'd on other grounds sub nom. Pharmachemie B.V. v. Barr Labs., Inc.,* 276 F.3d 627 (D.C.Cir.2002).

In sum, the court concludes that the circumstances weigh strongly in favor of consolidation. Accordingly, *Cermak,* No. 01–568L, shall be consolidated with *Wolfchild,* No. 03–2684L, pursuant to RCFC 42, to the extent that plaintiffs in *Cermak* state trust-mismanagement claims.

### D. *Motion to Intervene by the Lower Sioux Indian Community*

On April 18, 2006, the court granted leave for the Lower Sioux Indian Community ("Lower Sioux Community") to file a motion to intervene. Order of April 18, 2006.[20] On May 16, 2006, the Lower Sioux Community filed its Proposed Complaint in Intervention ("Lower Sioux Proposed Compl."). The Lower Sioux seek to intervene as of right as a plaintiff in this case pursuant to RCFC 24(a)(2). Lower Sioux Proposed Compl. at 5. In the alternative, the Lower Sioux Community seeks permissive intervention under Rule 24(b)(2). *Id.*

To implement the 1980 Act, the Department of the Interior transferred the trust corpus, which included the 1886 lands, monies, and other property, to three Indian communities: the Lower Sioux Community, the Shakopee Mdewakanton Sioux (Dakota) Community, and the Prairie Island Indian Community. *Wolfchild I,* 62 Fed.Cl. at 531–33. The Lower Sioux Community currently controls and administers the property transferred as a result of the Department of the Interior's implementation of the 1980 Act.[21] The Lower Sioux Community asserts several interests in this action, including its interest as the current custodian of the property transferred to it by the Department of the

---

**20.** The Lower Sioux Indian Community was recognized as an Indian Community pursuant to the Indian Reorganization Act of 1934. Lower Sioux Proposed Compl. at 3. The community is not a tribe because the loyal Mdewakanton renounced their tribal affiliations in the aftermath of the 1862 Sioux Outbreak and as part of the original arrangements in 1888, 1889, and 1890 for establishing a trust for their benefit. *Wolfchild I,* 62 Fed.Cl. at 527–29. The Lower Sioux Community, whose governing council determines its membership, reportedly is comprised of both lineal descendants and other persons.

**21.** After the 1980 Act was implemented, the control by the Communities of the 1886 lands became sufficiently extensive that the Department of the Interior explained to the Federal Circuit in *Cermak v. Babbitt,* 234 F.3d at 1359, that the 1886 land pertinent to that case was "owned by" the relevant Community (Shakopee), although the court also noted that the land was "held in trust by the United States for the Community's benefit."

Interior. *See* Lower Sioux Indian Community's Reply Memorandum in Support of Motion for Intervention ("Lower Sioux Reply") at 13. The Lower Sioux Community suggests that the outcome of this case will "greatly affect how the Community manages the portion of the trust corpus in its possession." *Id.* at 1. Additionally, the Community seeks "an accounting of all income, profits, proceeds, and other tangible benefits arising from the trust corpus owed to the members of the Lower Sioux Indian Community who are lineal descendants," and declaratory relief "tied and subordinate to an award of damages and remedy of accounting, describing the current and prospective legal duties and obligations owed to the lineal descendants ... by the Lower Sioux Community." Lower Sioux Proposed Compl. at 7.

On May 30, 2006, the government filed an opposition to the Lower Sioux Community's motion to intervene. The government focused on the Community's potential interests in (1) ensuring that its members who are lineal descendants are justly and fairly compensated, (2) ensuring that its members who are non-lineal descendants receive fair and just treatment as a consequence of any court action, and (3) furthering a final and binding judicial resolution on the issue of the government's actions taken pursuant to the 1980 Act. *See* Defendant's Opposition to the Motion to Intervene of the Lower Sioux Indian Community ("Def.'s Lower Sioux Opp.") at 4. The government challenges the Lower Sioux Community's ability to intervene on the grounds that the Community cannot satisfy the elements of RCFC 24 and that the Community lacks standing to bring suit. Def.'s

Lower Sioux Opp. at 5–6 (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C.Cir.2003), for the proposition that a plaintiff-intervenor must satisfy both RCFC 24 and the additional requirement of standing). Additionally, the government argues that even if the Community could satisfy some of these elements, this court would not have jurisdiction over the Community's claims. *Id.* at 11 n. 5. On June 12, 2006, the Lower Sioux Community filed a reply in support of its motion for intervention.[22]

1. *The Lower Sioux Community's role in administering trust property.*

The 1980 Act conveyed "all right, title, and interest of the United States" to the United States in trust for the communities, but did not terminate the trust created for the lineal descendants. *See Wolfchild I*, 62 Fed.Cl. at 530–32. Although the United States had held title to the 1886 lands and ancillary monies and other property as trustee, the equitable interest in that property was and is held by the lineal descendants of the loyal Mdewakanton. *See Wolfchild I*, 62 Fed.Cl. at 540–41; *Restatement (Third) of Trusts* § 42 (2003) ("[U]nless a different intention is manifested, or the settlor owned only a lesser interest, the trustee takes a non-beneficial interest of unlimited duration in the trust property"). The 1980 Act essentially created an overlay on the earlier trust.[23] The United States remained the named trustee, and there is no indication that the 1980 Act altered the fact that the original Appropriations Acts gave the Secretary of the Interior discretion to appoint agents to manage the trust properties. *See Wolfchild I*, 62 Fed.Cl.

---

**22.** On May 24, 2006, two members of the Lower Sioux Community Council, Joseph Goodthunder and Dennis Prescott, filed a motion for leave to file a brief as *amici curiae*, seeking to be heard regarding the posture of the Lower Sioux Community in this litigation. Responses to this motion were filed by plaintiffs, the government, and the Lower Sioux Community. A proposed brief on behalf of Messrs. Goodthunder and Prescott as *amici curiae* was proffered on July 31, 2006. It became apparent from the motion for leave to file a brief as *amici curiae* that Messrs. Goodthunder and Prescott are members of the Lower Sioux Community Council who opposed action by the Council authorizing the motion to intervene filed by the Community in this action. At the hearing held on July 18, 2006, the court

expressed its concern that any brief filed by the dissidents as *amici curiae* should focus on the Community's posture in the case and not address internal governance issues. Hr'g Tr. 132:21–25 (July 18, 2006). The brief proffered on behalf of Messrs. Goodthunder and Prescott adheres to these guidelines. Accordingly, the motion by Messrs. Goodthunder and Prescott for leave to file a brief as *amicus curiae* is granted.

**23.** Along these lines, the Federal Circuit observed in *Cermak v. Babbitt*, albeit in the different context of whether holders of certificates received assignments or allotments, a reference to the fact that the 1980 Act made a change in "the trust status of the land." 234 F.3d at 1363.

at 526–28 (quoting Act of June 29, 1888, 25 Stat. at 228–29) ("[the Secretary of the Interior] may appoint a suitable person to make the above-mentioned expenditures under his direction.").

Although the text of the 1980 Act did not require it, to implement the 1980 Act the Department of the Interior transferred the 1886 lands, monies, and other property to the Communities. *See Wolfchild I,* 62 Fed.Cl. at 531–32. In assuming possession of the 1886 lands and administering the lands, improvements, and monies, the Communities have assumed a fiduciary role as agents of the United States. " 'Agency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.' " *B & G Enters., Ltd. v. United States,* 220 F.3d 1318, 1323 (quoting *Restatement (Second) of Agency* § 1(1) (1958)). The Lower Sioux Community, claiming a custodial interest in a portion of the 1886 lands and property stemming from the government's delegation of trusteeship responsibilities, has an obligation to defend the propriety of the delegation. *Bogert's Trusts and Trustees* § 557 (2005) ("If a third person claims property interests by virtue of a delegation, he must defend the propriety of the trustee's conduct."). Additionally, as agents of the federal government in administering the trust on behalf of the trust beneficiaries, the Communities may be required to account for any trust mismanagement. The Communities have a fiduciary duty to the lineal descendants to administer the 1886 lands and associated monies according to the terms of the trust for the benefit of the lineal descendants of the loyal Mdewakanton, as well as to themselves as the beneficiaries of the overlaid trust created by the 1980 Act. *See Restatement (Third) of Trusts* § 80, cmt. g (Tentative Draft No. 4, 2005) ("In accepting the delegation of a trust function from a trustee, an agent assumes a fiduciary role with fiduciary responsibilities ... with potential liability for breach of duty."); *Bogert's Trusts and Trustees* § 484. "It is a clearly established principle in [equity], that whenever the trustee has been guilty of a breach of the trust, and has transferred the property,

by sale or otherwise, to any third person, the [beneficiary] has a full right to follow such property into the hands of such third person, unless [the third person] stands in the predicament of a *bona fide* purchaser, for a valuable consideration, without notice." *Oliver v. Piatt,* 44 U.S. (3 How.) 333, 401, 11 L.Ed. 622 (1845). *See Scott on Trusts* § 289 (2001); *Coleman v. Golkin, Bomback & Co., Inc.,* 562 F.2d 166, 169 (2d Cir.1977) (citing *Restatement (Second) of Trusts* § 289 (1959)) (stockholders receiving property held in trust by corporation take property subject to the trust).

### 2. *Standing.*

■ Standing requires that a plaintiff asserting a claim must have suffered an injury in fact that is concrete and particular, actual or imminent, fairly traceable to the defendant's action, and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (discussing the requirements for a party to establish standing under Article III of the United States Constitution). The government contends that the Lower Sioux Community has suffered no injury caused by the government's conduct that is likely to be redressed by this court. Def.'s Lower Sioux Opp. at 13. This argument fails because the Lower Sioux Community can demonstrate the necessary elements of standing under Article III.

At this stage in the proceedings, the precise nature of the Lower Sioux Community's interest in the part of the 1886 lands and property it currently controls remains unresolved. However, the community manifestly possesses interests in the trust property that are distinct from the interests of its individual members. The Community is the currently controlling custodian of "certain of the 1886 Lands, as well as certain other property and assets, which partially comprise the trust created for the benefit of the Loyal Mdewakanton and the Lineal Descendants." Lower Sioux Proposed Compl. at 3–4. "[The Lower Sioux] Community has broad non-economic rights that any custodian of trust assets possesses." Lower Sioux Reply at 13. By making the Community its agent for administering the trust property, the government

thrust the Community into a posture where it acquired potentially conflicting obligations respecting the portion of the trust corpus it controls. *See id.* at 1; *Credits Commutation Co. v. United States,* 177 U.S. 311, 315–16, 20 S.Ct. 636, 44 L.Ed. 782 (1900) (affirming a denial of a petition to intervene of right that relied upon speculative grounds, while contrasting the situation where a fund was at issue and a party's interest in the fund would be sufficient to support intervention of right because absent participation, a party might completely lose its interest in the fund); *see also Missouri–Kansas Pipe Line Co. v. United States,* 312 U.S. 502, 506, 61 S.Ct. 666, 85 L.Ed. 975 (1941) (allowing intervention to safeguard rights secured by a consent decree in an antitrust case).[24] Three Com-

munities, including Lower Sioux, have assumed their role as a direct result of the government's transfer of lands, improvements, and monies to the Communities; thus the Lower Sioux Community's current predicament is "fairly traceable" to the actions of the government. The Lower Sioux Community could additionally assert that it has already suffered a concrete injury if the government has improperly allocated the trust properties among the Communities, or improperly or incompletely defined the roles of the Communities as the government's agents in controlling and managing the trust assets. In short, the court finds that the interests of the Lower Sioux Community in the trust are sufficient to establish Article III standing.[25]

**24.** The government objects to the use of *parens patriae* standing and associational standing as bases to establish the Community's standing in this case. These objections are unavailing because they depend upon a misstatement of the factual bases for the Lower Sioux Community's application for intervention.

First, the government contends that the Community cannot represent all its members under the doctrine of *parens patriae,* which requires a tribe to act on behalf of all its members. Def.'s Lower Sioux Opp. at 7–10. The government avers that because the members of the Community do not all have identical interests and rights, as evidenced by the recent motions by Lower Sioux dissidents Dennis Prescott and Joseph Goodthunder for leave to file a brief as *amici curiae,* the Community cannot claim to represent all its members. *Id.* This argument fails because here the Community does not represent its members in their individual capacities.

Additionally, the government points out that the Community cannot rely on associational standing in this case because the lineal-descendant members of the Community are seeking monetary damages. Def.'s Lower Sioux Opp. at 13. Although an association can generally rely on the injuries to its members to support the association's standing, an association does not have standing if participation of its members is required. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). This line of argument is inapplicable to the case at hand, however, because the Community's standing stems from its own rights as a separate legal entity, acting as the government's agent, and the potential injuries it may suffer as the entity, and is not based upon injuries to its members.

**25.** The Lower Sioux Community raises the issue whether an action can proceed as to all plaintiffs, including intervenors, so long as one party in the case has standing. The Community argues that

the conclusions of a majority of circuit courts of appeals on this issue favor intervention and should apply to the case at hand. Lower Sioux Reply at 2 (citing *Roeder,* 333 F.3d at 233; *San Juan County, Utah v. United States,* 420 F.3d 1197, 1205 (10th Cir.2005); *United States v. Tennessee,* 260 F.3d 587, 595 (6th Cir.2001); *Dillard v. Baldwin County Comm'rs,* 225 F.3d 1271, 1277–78 (11th Cir.2000); *Ruiz v. Estelle,* 161 F.3d 814, 829–30 (5th Cir.1998); *Yniguez v. Arizona,* 939 F.2d 727, 731 (9th Cir.1991); *United States Postal Serv. v. Brennan,* 579 F.2d 188, 190 (2d Cir.1978)). The Lower Sioux Community also points to Supreme Court cases suggesting that an intervenor need not satisfy the requirements for standing if the original plaintiff has standing because one plaintiff's standing suffices to satisfy the case or controversy requirement under Article III. Lower Sioux Reply at 3 (citing *Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981)) ("because California has standing, we do not consider the standing of the other plaintiffs"); *Village of Arlington Heights v. Metropolitan Housing Develop. Corp.,* 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (because at least one plaintiff had standing, Supreme Court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."). However, the Supreme Court has specifically refrained from deciding "whether a party seeking to intervene before a District Court must satisfy not only the requirements of [Fed.R.Civ.P.] 24(a)(2), but also the requirements of Art. III." *Diamond v. Charles,* 476 U.S. 54, 68–69, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (noting "anomalous decisions in the Courts of Appeals").

There appears to be no Federal Circuit case on point. If the court were to reach this argument and follow the rationale of the courts of appeals in the cases cited above, the Community would be allowed to intervene because this court has already recognized the individual plaintiffs'

### 3. *Intervention of right under RCFC 24(a)(2).*

The government does not contest the timeliness of the Community's motion.

a. *The Lower Sioux Community has an interest relating to the property at issue in this action and is so situated that disposition of this case may impair its ability to protect that interest.*

A party seeking to intervene under Rule 24(a) must allege an interest of " 'such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment.' " *American Maritime Transp.*, 870 F.2d at 1561 (quoting *American Telephone & Telegraph*, 642 F.2d at 1292). The government challenges whether the Lower Sioux Community has any interest relating to the property at issue in this case. As noted *supra*, the government's challenges to the Community's interests fail primarily because the government itself accorded the Community a controlling interest in a portion of the property at issue, in conjunction with the government's implementation of the 1980 Act. Moreover, the court may grant intervention under Rule 24(a) when the disposition of a case would involve a determination of the nature of the rights the applicant for intervention has in the property in dispute. *See Karuk Tribe of Cal. v. United States*, 28 Fed.Cl. 694, 698 (1993) ("Because a judgment in this case could directly impair the Tribe's ability to protect its interests, the court concludes that the Tribe must be permitted to intervene as of right."). In *Karuk Tribe*, an Indian tribe sought intervention to protect its right to exclude others from the reservation land it possessed; the plaintiffs argued that they were entitled to share in some of the tribe's real property rights, including the right to use the land for hunting and fishing. *See id.* at 697. The Lower Sioux Community similarly seeks to protect its current interest in 1886 lands and property.

Furthermore, the current plaintiffs have requested an accounting incidental to the calculation of a damages award for the government's breach of the trust agreement between the United States and the loyal Mdewakanton. As the government's agent, the Community would necessarily be involved in such an accounting. *See Bogert's Trusts and Trustees* § 970 ("Intervention in the accounting proceeding should be permitted to any one whose financial interests may be affected thereby."). Thus, the Lower Sioux Community would be a necessary party to any accounting proceeding incidental to an award of compensation.

Additionally, if the Lower Sioux Community is not permitted to join as a party, the Community may lose its opportunity to seek indemnification from the United States respecting its role as agent. The United States may be liable for any losses suffered by the beneficiaries or any wrongful gains of the Communities. *See Coast Indian Comm. v. United States*, 213 Ct.Cl. 129, 550 F.2d 639, 652–53 (1977) ("The United States, when acting as trustee for the property of its Indian wards, is held to the most exacting fiduciary standards ... and the responsibility of the trustee includes accountability for the acts of those agents, even where wrongful and unauthorized."). The Communities may have a claim for indemnification from the United States, the principal, for any liability relating to the administration of the trust for the benefit of the lineal descendants. *See Restatement (Third) of Agency* § 8.14 (Tentative Draft No. 6, 2005) ("A principal has a duty to indemnify an agent ... (2) unless otherwise agreed, ... (b) when the agent suffers a loss that fairly should be borne by the principal in light of their relationship.").

Although the exact nature of the Community's interests in the trust property is as of yet unresolved, because the Department of the Interior's implementation of the 1980 Act transferred an interest to the Community as an entity, and the resolution of this case necessarily involves determining the nature

standing. *Wolfchild I*, 62 Fed.Cl. at 538 ("The plaintiffs allege that they have suffered a concrete and actual injury in fact—financial harm.... Moreover, this financial harm was allegedly caused by the defendant's breach of its

fiduciary and contractual duties, and awarding the plaintiffs damages is likely to redress that harm."). However, the court need not, and does not, reach this issue because the Lower Sioux Community possesses Article III standing.

of the Community's interests, a judgment in the case will have a direct effect on the Community sufficient to require intervention as of right pursuant to RCFC 24.

b. *Adequacy of representation by the current plaintiffs.*

An applicant for intervention bears a minimal burden to show that its interest would not be adequately represented by parties already in the lawsuit. *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972); *Natural Resources Defense Council v. Costle,* 561 F.2d 904, 911–13 (D.C.Cir.1977). As noted, the Lower Sioux Community, as the current custodian of a portion of the 1886 lands, has an interest in any accounting proceeding that is distinct from the interests of the individual plaintiffs and from that of the United States. Accordingly, the Community's interest is not adequately represented by the current parties.

c. *Effect on issues in the case.*

The government asserts that the addition of the Lower Sioux Community as an intervening plaintiff would impermissibly expand the issues in this case. Def.'s Lower Sioux Opp. at 11–12 (citing *Seminole Nation of Okla. v. Norton,* 206 F.R.D. 1, 7 (D.D.C.2001) (noting that an intervenor may not change the issues framed between the original parties.)). *See Vinson v. Washington Gas Light Co.,* 321 U.S. 489, 498, 64 S.Ct. 731, 88 L.Ed. 883 (1944) ("an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding"). In *Seminole Nation,* the plaintiff-intervenor sought to expand the original plaintiff's single-count complaint by filing its own ten-count complaint, including claims already pending in a separate case. 206 F.R.D. at 6. The court found that the intervenor's claims did not directly relate to the merits of the original plaintiff's claim. *Id.* at 6–7. Here, the government takes the position that the only issue is that the lineal descendants have not received benefits from or use of the trust property, in contravention of the trust established by the

United States for the lineal descendants, Def.'s Lower Sioux Opp. at 11–12, and that any interest the Lower Sioux Community claims that differs from the individual plaintiffs' interests would impermissibly expand the scope of the case.

However, the issues already present in this case are broader than the government admits. The interpretation of the 1980 Act, central to plaintiffs' claims of breach of trust and the government's defenses to those claims, is manifestly at issue in this case. One aspect of interpreting the 1980 Act involves determining what interests, if any, were validly transferred to the Communities by the United States after the 1980 Act, especially in light of the fact that the United States previously held title as trustee and not also as the beneficial owner. In short, the Communities' interests are already necessarily present in the case. As the court has previously stated, the Communities have a "strong" interest in the matters before the court. *Wolfchild I,* 62 Fed.Cl. at 536. Accordingly, the government's argument that the Lower Sioux Community's intervention would expand impermissibly the scope of the issues in the present case is without merit.

In sum, the court finds that the Lower Sioux Community possesses standing to intervene in this case and is entitled to intervene as of right pursuant to RCFC 24(a). The motion to intervene by the Lower Sioux Community is therefore granted.

### E. *Summons*

On March 6, 2006, plaintiffs filed a motion requesting that the court issue summonses to the Lower Sioux, Prairie Island, and Shakopee Indian Communities pursuant to 41 U.S.C. § 114(b), as well as to the individual members of these Communities. *See* Pls.' Summons Mot. at 27–31. This motion has been fully briefed by the parties. Plaintiffs' motion is moot as to the Lower Sioux Community because that Community has independently moved to intervene as a party plaintiff, as discussed *supra.* Accordingly, the analysis that follows focuses only upon whether summonses should issue to the Prairie Island and Shakopee Indian communities, as well as to members of all three communities.

The statute upon which plaintiffs rely, 41 U.S.C. § 114, was enacted as Section 14 of the Contract Settlement Act of 1944. *See* Act of July 1, 1944, ch. 358, 58 Stat. 649, 663. The Act deals generally with resolution of claims arising from termination of war contracts during World War II, and Section 114 governs the role of this court and its predecessors in that respect. Subsection 114(b) authorizes this court to summon a third party to appear in a suit to defend its interests:

> (b) Procedure. The United States Court of Federal Claims, on motion of either of the parties, or on its own motion, may summon any and all persons with legal capacity to be sued to appear as a party or parties in any suit or proceeding of any nature whatsoever pending in said court to assert and defend their interests, if any, in such suits or proceedings, within such period of time prior to judgment as the United States Court of Federal Claims shall prescribe.

41 U.S.C. § 114(b) (first sentence).

This Subsection is not restricted to claims arising from terminated war contracts. *See Bowser, Inc. v. United States*, 190 Ct.Cl. 441, 420 F.2d 1057, 1060 (1970). Rather, it applies "in any suit or proceeding of any nature whatsoever pending in [this] court." 41 U.S.C. § 114(b) (first sentence). The Subsection has been invoked most often by the government in situations where, for example, the government as a defendant in a case had disbursed money or property to a person or entity other than the plaintiff under a mistake of fact or law, and it sought to recover the money erroneously paid over. *See Maryland Casualty Co. v. United States*, 135 Ct.Cl. 428, 141 F.Supp. 900, 901 (1956). However, Subsection 114(b) is not restricted to that scenario or to invocation only by the government. On its face, the Subsection authorizes a motion for issuance of a summons by "either of the parties, or [by the court] on its own motion," 41 U.S.C. § 114(b). Plaintiffs rely on this specific statutory authority as grounds for their motion to issue summonses to the Communities and their members. Plaintiffs assert that the Communities have the requisite interests in the case because they were given control over the 1886 lands, improvements, and monies by the De-

partment of the Interior after the 1980 Act was passed and their members have interests that could be affected by the outcome of this case, whether or not they are descendants of loyal Mdewakanton.

### 1. *Application of 41 U.S.C. § 114(b)*.

The government avers that a plaintiff may not move for summons of a third party pursuant to 41 U.S.C. § 114(b). *See* Defendant's Opposition to Plaintiffs' Motion for Court to Issue Summonses to Communities and their Members Pursuant to 41 U.S.C. § 114(b) at 1 ("Def.'s Summons Opp."). Principally, the government relies on RCFC 14, which addresses third-party practice in this court. Prior to the 2002 revisions to the court's rules, there was indeed some correlation between Rule 14 and Subsection 114(b). However, that correlation was incomplete and proved to be problematic. *See, e.g., Bird v. United States*, 51 Fed.Cl. 536 (2002) (analyzing the history and operation of Subsection 114(b) and the prior versions of Rule 14); *Oak Forest, Inc. v. United States*, 26 Cl.Ct. 1397 (1992) (same). The government cites both *Bird* and *Oak Forest* for the proposition that the authority prescribed in Subsection 114(b) for issuing summonses is available only to the government. Def.'s Summons Opp. at 2–5. However, this argument is unavailing. Among other things, in 2002, the partial correlation between the former Rule 14 and Subsection 114(b) suggested by both *Bird* and *Oak Forest* was superseded by revisions to RCFC 14.

The 2002 changes to Rule 14 explicitly decoupled that Rule from that part of Subsection 114(b) dealing with motions for summonses by a party other than the government. The Rules Committee Note accompanying the 2002 Revision states, in pertinent part: "RCFC 14 has been substantially revised. The order of the rule has been changed to distinguish more clearly between the two types of actions it permits with respect to entities that are not yet parties to the suit. New subdivision (a) [dealing with issuance of summonses] deals exclusively with summons to persons whom *the United States* seeks to join formally as third parties." (emphasis added). By implication, the revised Rule 14 simply does not

pertain to a potential motion for issuance of a summons under Subsection 114(b) by a *plaintiff,* or for that matter, by the court, as authorized by Subsection 114(b). Moreover, RCFC 14(a) deals only with the *procedure* by which the government might move to bring in a third party into a case. The specification of that procedure in the Rule for a motion by the government could not have the effect of amending Subsection 114(b) to elide the authority for a plaintiff or the court to cause a summons to be issued to a third party in an appropriate case. Furthermore, Subsection 114(b) itself provides a procedural guide for such issuance at the behest of a plaintiff or the court, as addressed *infra.* In sum, the court will apply Subsection 114(b) according to its terms.[26]

Prior precedents interpreting and applying Subsection 114(b) provide a guide for application of the statute in this instance. In *Maryland Casualty*, the question presented was whether the government, being sued for money that the government at one time held in its hands but had disbursed to a third party under a mistake of fact or law, had the legal right under Subsection 114(b) to have the third party brought into the case. *Id.* at 901. In *Maryland Casualty*, the Court of Claims examined the history of the Contract Settlement Act, including Subsection 114(b).

The history of the Act indicated that Subsection 114(b) was created to promote judicial economy by avoiding repetitive litigation of the same issues, as well as to protect the government from potentially inconsistent judgments. *See id.* at 902–04. Based on this determination, the Court of Claims found that the government could move to have a third party brought into the case and that the court had authority to grant such a request. *Id.* at 905–06. Subsequent decisions reaffirmed this position. *See Southern Cal. Edison Co. v. United States,* 226 F.3d 1349, 1355–56 (Fed.Cir.2000); *Bowser,* 420 F.2d at 1062–63; *Christy Corp. v. United States,* 181 Ct.Cl. 768, 387 F.2d 395, 397–98 (1967); *Seaboard Sur. Co. v. United States,* 144 Ct.Cl. 686 (1959).

The Federal Circuit and the Court of Claims have construed Subsection 114(b) to require that the claim against the third party must be "derived through the contract or claim upon which the [original] plaintiff instituted suit." *Oliver–Finnie,* 137 F.Supp. at 721. The interests of the Communities in the case at hand involve control over, and a custodial interest in, the trust property that is the subject of plaintiffs' claim. The Communities obtained their interests in the trust property from the Department of the Interior in implementation of the 1980 Act, which the court has determined led to the breach of

---

26. Additionally, to the extent that a rule of this court is inconsistent with the terms of a statute (and the court does not here find RCFC 14 to be inconsistent with Subsection 114(b)), the terms of the statute must be given effect. Several cases in this court and predecessors that predated the 2002 revision of this court's rules indicated that "[w]ell-established Court of Claims precedent prohibited plaintiffs from summoning third-party defendants.... Such precedent overrode the plain language of the statute." *Oak Forest,* 26 Cl.Ct. at 1401 n. 7 (citing *Rolls–Royce Ltd. v. United States,* 176 Ct.Cl. 694, 364 F.2d 415, 417–18 (1966)); *Oliver–Finnie Co. v. United States,* 133 Ct.Cl. 555, 137 F.Supp. 719, 720–21 (1956), *Weis v. United States,* 130 Ct.Cl. 815, 1955 WL 2751 (1955). In this synopsis, *Oak Forest* significantly and materially overstated the holdings of *Rolls–Royce, Oliver–Finnie,* and *Weiss.* In actuality, in *Rolls–Royce,* the Court of Claims commented that "[Subsection 114(b) of the Contract Settlement A]ct is limited to situations in which the third-party defendants have an interest in a plaintiff's claim against the Government." 364 F.2d at 417. That describes the circumstances of the instant case. Moreover, in *Rolls–Royce,* the Court of Claims went on to comment that the interest of the third-party defendants in plaintiff's claim against the government "might [be one the third-party defendants could] assert against the United States, or as a defense to the plaintiff's claim, or in connection with which the United States might assert a claim against the third party." *Id.* at 417–18 (citing *Oliver–Finnie,* 133 Ct.Cl. 555, 137 F.Supp. 719; *Weis,* 130 Ct.Cl. 815). These possibilities are present in this case. In all events, with the decoupling of RCFC 14 from Subsection 114(b) in 2002, the conflict wrongly perceived in *Oak Forest* between RCFC 14 and Subsection 114(b) no longer appertains.

It is nonetheless true that a plaintiff moving for issuance of a summons to a third-party defendant may not seek damages payable by that third-party defendant, or damages on causes of action not cognizable by the court. *See Rolls–Royce,* 364 F.2d at 418 (citing 41 U.S.C. § 114(c); *Berkeley v. United States,* 149 Ct.Cl. 549, 276 F.2d 9 (1960)). *See* the more detailed discussion *infra,* at 535.

the trust at issue in this case. Therefore the posture of the Communities is "derived through the contract or claim upon which the [original] plaintiff instituted suit." *See Oliver–Finnie,* 137 F.Supp. at 721. The Communities in this case are situated similarly to the third party in *Maryland Casualty,* where the government had disbursed funds to the third party being brought into the case by a summons. *See Maryland Cas.,* 141 F.Supp. at 901.

Joining the Communities as third parties to this case would promote judicial economy by avoiding repetitive litigation of the same issues. *See Maryland Cas.,* 141 F.Supp. at 902–04. Joinder would also aid resolution of the accounting that is requested as a predicate for a damage award. Because the Communities are acting as agents of the federal government in administering the trust property, they necessarily would have to participate in any accounting. *See supra,* at 529 (citing *Restatement (Third) of Trusts* § 80, cmt. g (Tentative Draft No. 4, 2005); *Bogert's Trusts and Trustees* § 484; *Oliver v. Piatt,* 44 U.S. (3 How.) at 401; *Scott on Trusts* § 289). The court therefore finds that circumstances of this case are appropriate to provide for issuance of summonses to the Prairie Island and Shakopee Indian Communities pursuant to 41 U.S.C. § 114(b).[27]

In accord with application of 41 U.S.C. § 114 in this circuit, the Prairie Island and Shakopee Communities may be summoned as third parties pursuant to Subsection 114(b). However, the participation of these Communities is subject to limitations because the motion for summons was made by plaintiffs, not the government. This court cannot issue a judgment that calls upon the Communities to pay monetary damages. *See Rolls–Royce,* 364 F.2d at 418, quoted *supra,* at 534 n. 26. The rationale for this limitation is that:

The principal purpose of the statute was not ... to provide for the adjudication of all possible rights and obligations which might stem, however remotely, from the transaction involved in the principal suit. It was to permit the parties to bring in other persons who might, if not foreclosed, later show that they owned or had an interest in the claim sued on, or whose possible right might, if not foreclosed, be used as a defense by the United States to defeat the principal claimant.

364 F.2d at 418. In this same vein, 41 U.S.C. § 114(c) states:

The jurisdiction of the United States Court of Federal Claims shall not be affected by this chapter except to the extent necessary to give effect to this chapter, and no person shall recover judgment on any claim, or on any interest in any claim, in said court which such person would not have had a right to assert in said court if this section had not been enacted.

Accordingly, plaintiffs in the case at hand may pursue monetary damages only against the government, and, if any judgment for damages ensues, it would be left to the discretion of the government to determine whether to seek indemnification from the Communities. Similarly, it would be up to the Communities to decide whether to seek indemnification from the government.

### 2. *Sovereign immunity.*

▊ Finally, in seeking to forestall issuance of summonses to the Shakopee and Prairie Island Communities, the government avers that these Communities may not be summoned because the Communities enjoy sovereign immunity. Def.'s Summons Opp. at 7–8 (noting that Subsection 114(b) "explicitly limits the class of persons who may be summoned under its authority to those 'with legal capacity to be sued' "). Tribal

---

**27.** The individual members of the Communities do not stand in the position of agents entrusted with the implementation of the trust. The trust assets were transferred to the Communities as entities, not to the individual members. Therefore there is no basis for issuing summonses to the individual members, and the plaintiffs' motion to issue summonses to the individual members is denied.

In *Wolfchild II,* the court provided for notice of the present litigation to be issued to those Community members who are lineal descendants of the loyal Mdewakanton. *See* 68 Fed.Cl. at 795–98 & Appendix A, 801–05. In this respect, individual members of the Communities have been provided ample opportunity to assert their interests before this court.

sovereign immunity is a doctrine of federal common law and reflects the United States Constitution's treatment of Indian tribes as governments in the Indian Commerce Clause. *See Cohen's Handbook of Federal Indian Law* 635 (Neil Jessup Newton, et al., eds.2005) (citing U.S. Const. Art. 1, § 8.). Tribal sovereign immunity is commonly considered to be a "residual" form of sovereignty held by a federally-recognized tribe, even where a tribe does not have historical roots pre-dating the arrival of European explorers and settlers; such sovereignty is founded on the concept that Indian tribes possessed certain rights based on their existence as distinct political entities exercising authority over their members prior to the incorporation of their territory into the United States. *See Kahawaiolaa v. Norton,* 386 F.3d 1271, 1272–73 (9th Cir.2004) (citing *United States v. Wheeler,* 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)), *superseded in part by statute,* Department of Defense Appropriations Act, 1991, Pub.L. No. 101–511, § 8077, 104 Stat. 1856, 1892–93 (1990) (codified at 25 U.S.C. § 1301(2), (4)). Thus, " 'tribes retain whatever inherent sovereignty they had as the original inhabitants of this continent to the extent that sovereignty has not been removed by Congress.' " *Kahawaiolaa,* 386 F.3d at 1273 (quoting *Montana v. Gilham,* 133 F.3d 1133, 1137 (9th Cir.1998)). Indian tribes are immune from lawsuits or other process in federal courts unless "Congress has authorized the suit or the tribe has waived its immunity." *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.,* 532 U.S. 411, 416–17, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) (quoting *Kiowa Tribe of Okla. v. Manufacturing Techs., Inc.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998)).

To enjoy the benefits of tribal sovereign immunity, an Indian tribal entity must be recognized by the federal government. *Kahawaiolaa,* 386 F.3d at 1273. "Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated 'Procedures for Establishing that an American Indian Group Exists as an Indian Tribe'; or by a decision of a United States court." Federally Recognized Indian Tribe List Act of 1994, Act of Nov. 2, 1994, Pub.L. No. 103–454, § 103, 108 Stat. 4791 *(codified at* 25 U.S.C. § 479a). In 1978, the Department of the Interior established an administrative mechanism by which non-recognized tribes could become eligible for federal services and legal protections. *See* Alva C. Mather, *Old Promises: The Judiciary and the Future of Native American Federal Acknowledgment,* 151 U. Pa. L.Rev. 1827, 1838 & n. 64 (2003) (citing 25 C.F.R. § 83 (2002)). If a tribe is recognized through the processes set forth in 25 C.F.R. § 83, "the tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes." 25 C.F.R. § 83.2 (2006). By statute, the Department of the Interior must from time to time publish "in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 479a–1. *See, e.g.,* 68 Fed.Reg. 68180 (Dec. 5, 2003) (Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs). Some courts have indicated that a tribe's presence on or absence from the Department of the Interior list may be decisive of the existence of a federal-tribal "government-to-government" relationship. *See, e.g., Richmond v. Wampanoag Tribal Court Cases,* 431 F.Supp.2d 1159, 1165–66 (D.Utah 2006).

The Prairie Island, Lower Sioux, and Shakopee Communities were not considered "tribes" when they were organized under the Indian Reorganization Act of 1934.[28] In

---

**28.** Past court rulings and determinations by the Department of the Interior made a distinction between a "tribe," "band," or "community". *See, e.g., Montoya v. United States,* 180 U.S. 261, 266, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901) ("By a 'tribe' we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory; by a 'band,' a company of

1938, with respect to the then-proposed constitutions of the Lower Sioux and Prairie Island Communities, the Solicitor of the Bureau of Indian Affairs stated that:

> Neither of these two Indian groups constitutes a tribe but each is being organized on the basis of their residence upon reserved land. After careful consideration in the Solicitor's Office it has been determined that under section 16 of the Indian Reorganization Act a group of Indians which is organized on the basis of a reservation and which is not an historical tribe may not have all the powers enumerated in the Solicitor's opinion on the Powers of Indian Tribes dated October 25, 1934. *The group may not have such of those powers as rest upon the sovereign capacity of the tribe but may have those powers which are incidental to its ownership of property and to its carrying on of business.*

Pls.' Summons Mot. Ex. 23A (Memorandum from Solicitor, Bureau of Indian Affairs, to Mr. Zimmerman, Assistant Comm'r of Indian Affairs (Apr. 15, 1938)) (emphasis added). To the same effect, a Bureau of Indian Affairs memorandum in 1969 regarding the then-proposed constitution for the Shakopee Community determined that the Community could not refer to itself as a "tribe:"

> [A]ll references to Shakopee Mdewakanton Sioux "Tribe" must be changed to "Community." Consideration was given to allowing the group to call itself a band. However, as *the group does not possess the inherent powers of a tribe,* the distinction between tribe and band appears to be too close to permit the [usage] of band. The Prior Lake [Shakopee] group will have to accept "Community" as a basis for organization in that the right to organize is based on similar grounds as those employed by the organized communities at Prairie Island and Lower Sioux.

Pls.' Summons Mot. Exh. 31 (Memorandum from Chief, Div. of Tribal Operations, Bureau of Indian Affairs, to Area Director, Minneapolis Area (July 16, 1969)) (emphasis added). In spite of these historical interpretations by the Bureau of Indian Affairs, at some point since the 1969 memorandum, all three Communities have been added to the list of Indian Entities Recognized and Eligible to Receive Services maintained by the Bureau of Indian Affairs. *See* 68 Fed.Reg. at 68181, 68182. The listed entities "are acknowledged to have the immunities and privileges available to other federally acknowledged Indian tribes." *Id.* at 68180.[29]

Given these considerations, for the purposes of deciding plaintiffs' motion to issue summonses to the Communities, the court assumes (without deciding) that the Communities possess some sort of sovereign immunity. The court thus accepts, for purposes of the pending motion to issue summonses, one of the predicates for the government's argument that sovereign immunity precludes the court from issuing summonses to the Communities.[30] However, that predicate is insuf-

---

Indians not necessarily, though often, of the same race or tribe, but united under the same leadership in a common design."). Under the current Department of the Interior listing procedures, however, the distinction between whether a group is termed a "tribe," "band," or "community" is apparently irrelevant to whether a group will be recognized; Indian groups denominated "tribes," and "bands," and "communities" all appear on the list of recognized tribes published by the Department. *See* 68 Fed.Reg. at 68180.

**29.** Two prior decisions involving these Communities indicate that the Communities probably possess at least a limited form of sovereign immunity. *See Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.,* 991 F.2d 458, 460–63 (8th Cir.1993) (discussing the extent to which tribal sovereign immunity protects Prairie Island's officers from suit); *Maxam v. Lower Sioux Indian Cmty. of Minn.,* 829 F.Supp. 277, 281 (D.Minn.1993) (stating that "[i]t is well-established that Indian tribes [sic] have immunity to suit in federal court absent congressional abrogation or a clear waiver by the tribe [sic]") (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). The respective courts in each of these cases did not unequivocally hold that the Communities actually possessed sovereign immunity but proceeded to decide the cases as if the Communities had acquired some form of sovereign immunity.

**30.** *Amici* Prescott and Goodthunder maintain that if there were doubt whether the Communities possessed sovereign immunity, amendments adopted in 1994 to the Indian Reorganization Act ensured that the Communities would receive the benefits incidental to tribal sovereign immunity thereafter. *See* Brief *Amicus Curiae* of Dennis Prescott and Joseph Goodthunder at 2–5.

ficient; the government ignores the fact that the Communities, in controlling and administering the trust properties, are acting as agents of the federal government, the trustee. The Communities, therefore, are acting not in a sovereign capacity but as "arm[s] of the Federal Government." *Wheeler,* 435 U.S. at 328, 98 S.Ct. 1079; *see also United States v. Karlen,* 476 F.Supp. 306, 310 (D.S.D.1979) (citing *Wheeler* for the proposition that 28 U.S.C. § 1346 does not waive the sovereign immunity of a tribe from suit when the tribe acts "as part of its retained sovereignty and not as an arm of the Federal Government."). If the United States does not have sovereign immunity in this case, and it does not because of the Indian Tucker Act, 28 U.S.C. § 1505, then neither does its agent have sovereign immunity even though that agent is an organized and recognized Indian community. *See Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 153–54, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) ("This Court has found ... a divestiture [of Indian sovereign immunity] in cases where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government.... [I]t must be remembered that tribal sovereignty is dependent upon, and subordinate to, ... the Federal Government."); *Cohen's Handbook of Federal Indian Law* 650–51 (Indian Tucker Act constituted a waiver of sovereign immunity).

A number of cases in this circuit are instructive in determining when one sovereign is in fact acting as an agent of another sovereign government. In *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991), the United States Environmental Protection Agency issued an order authorizing and directing the State of California to enter upon the plaintiffs' land to establish monitoring wells. 952 F.2d at 1369–70. The Federal Circuit held that the plaintiffs could sue the United States under a takings theory because the State's activities within the scope of EPA's Order

are attributable to the Federal Government for purposes of takings law just as are the activities of EPA itself. As the Court in *Loretto [v. Teleprompter,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)] observed, "[a] permanent physical occupation authorized by [a government] is a taking without regard to whether the [government], or instead a party authorized by the [government], is the occupant." 458 U.S. at 432 n. 9, 102 S.Ct. 3164. In *Loretto* the authorizing government was a state, rather than the federal government, but the principle remains the same.

There is no question but that California officials were acting under the authority of the 1983 Order, and in pursuance of the State's formal Cooperative Agreement with the Government to assist in carrying out Superfund activities, including this one, and with substantial funding from the Government. That the State had authority to

Amici refer to a statute entitled "Technical Amendments: Indians," Pub.L. No. 103–263, 108 Stat. 707 (1994). Section 5 of the statute added the following subsections to 25 U.S.C. § 476:

(f) PRIVILEGES AND IMMUNITIES OF INDIAN TRIBES; PROHIBITION ON NEW REGULATIONS.—Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 *et seq.,* 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

(g) PRIVILEGES AND IMMUNITIES OF INDIAN TRIBES; EXISTING REGULATIONS.— Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on the date of enactment of this Act and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect. 108 Stat. at 709. Given that the language of the statute is vague and that it includes no reference to "communities", it is ambiguous whether subsections (f) and (g) were added for the purpose of ensuring that Indian communities such as Prairie Island and Shakopee would also receive the benefits of sovereign immunity. However, because the court assumes without deciding that these Communities possess sovereign immunity, the court does not need to resolve this question at this time.

act on its own initiative, as the Government contends, is immaterial.

*Hendler,* 952 F.2d at 1379. Similarly, in *Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996) (*en banc* ), the Federal Circuit determined that the federal government was liable for a taking of property where a municipality acted under federal authority, *viz.,* an order by the Interstate Commerce Commission pursuant to the National Trails System Act, 16 U.S.C. § 1247(d). 100 F.3d at 1529, 1549–51. *See also B & G Enters.,* 220 F.3d at 1323–25 (the federal government was *not* liable for a taking where the State of California enacted restrictions on the placement on tobacco vending machines to enforce *its own law* prohibiting tobacco sales to minors *as well as to implement a federal program* through which the State could obtain grant money); *Rose Acre Farms, Inc. v. United States,* 373 F.3d 1177 (Fed.Cir.2004) (citing *B & G Enterprises* for the proposition that "attribution [to the federal government for actions of state officials] is proper ... only if the state officials were acting as agents of the federal government or pursuant to federal authority."). Each of these cases stands for the proposition that attribution of the actions of one sovereign to another sovereign is appropriate where one sovereign acts at the behest of the other sovereign, not in its own sovereign capacity.

In this instance, the Department of the Interior, in implementing the 1980 Act, transferred control of the trust property, improvements, and monies to the Communities. The Communities thus have acted as agents of the Department of the Interior. Because the Prairie Island and Shakopee Communities were acting as arms of the Federal Government and not as independent sovereigns, tribal sovereign immunity does not apply and does not bar the court from issuing summonses to these Communities pursuant to 41 U.S.C. § 114(b), insofar as their role and actions as agents are concerned. Accordingly, for the reasons stated above, the court will grant plaintiffs' motion to issue summonses to the Prairie Island and Shakopee Indian Communities.

**3.** *Service of the summonses.*

Procedurally, 41 U.S.C. § 114(b) provides methods of service of a summons, as follows:

*If the name and address* of any such person *is known* or can be ascertained by reasonable diligence, and if he resides within the jurisdiction of the United States, *he shall be summoned to appear by personal service;* but if any such person resides outside of the jurisdiction of the United States, or is unknown, or if for any other good and sufficient reason appearing to the court personal service cannot be had, he may be summoned by publication, under such rules as the court may adopt, together with a copy of the summons mailed by registered mail to such person's last known address.

41 U.S.C. § 114(b) (second sentence) (emphasis added). In this instance, the address of the Shakopee and Prairie Island Communities is well known, and personal service consequently may be had upon those Communities. To effectuate service, the court directs the Clerk to arrange for personal service by requesting the aid of the United States Marshal for the District of Minnesota for actual delivery of the summonses.

### CONCLUSION

For the reasons stated, plaintiffs' motion to file a Third Amended Complaint [130, 231] is GRANTED.

The motions to intervene filed by the R. Cermak group [114], the Stephens group [126], the J. Cermak group [131], the Anonymous Walker group [147],[31] the Mozak group (amended) [159, 215, 221], the Felix group [161], the Henderson group [164], the Klingberg group [167], the Saul group [169], the Alkire group [171], the Arnold group [172], the Enyard group (amended) [173, 198, 205, 243], the Burley group [176], the Rooney group [177, 240], the Rocque group (amended) [179, 218], the Zephier group [180], the Ferris group [207], the Trudell group [208], the Taylor group [210], the French group [212], the Henry group [213], the Garreau group [216], the Lafferty group [190], the Whipple group [191], the Lowe group [192], the Blaeser group [193], the DuMarce group

**31.** The motion to withdraw John Doe 16 from this group [188] is GRANTED.

(as supplemented and amended) [194, 195, 246], the Cournoyer group [196], the Robinette group [199], the Kimbell group [200], the Wanna group [202], the Vassar group [203], the Anonymous Blair group [206], the Ke Zaphier group [225], the Abrahamson group [226], and the Godoy group [238] are GRANTED.[32] The Clerk shall file each of the proposed complaints filed by these groups of intervening plaintiffs.[33]

The motion to intervene filed by the Lower Sioux Indian Community [119] is GRANTED, and the Clerk is directed to file the proposed complaint in intervention as a plaintiff [140] filed by that group.

The motion for leave to file a brief *amici curiae* filed by Joseph Goodthunder and Dennis Prescott [145, 242] is GRANTED.

Plaintiffs' motion for the court to issue summonses to the Communities [102] pursuant to 41 U.S.C. § 114(b) is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as the Prairie Island and Shakopee Communities are concerned. It is denied with respect to the Lower Sioux Community because the court has granted that Community's motion to intervene as a plaintiff. It is also denied as to the Communities' members. The Clerk shall cause summonses to issue to the Shakopee Mdewakanton Sioux (Dakota) Community and to the Prairie Island Indian Community in Minnesota and shall enlist the aid of the United States Marshal for the District of Minnesota in accomplishing personal service of the summonses so issued. The form of summons to be used by the Clerk is appended as Addendum A.

Plaintiffs' cross-motion for partial summary judgment [142] in response to the motions for leave to intervene filed by the J. Cermak group, the Stephens group, and the R. Cermak group is DENIED. The cross-motion for issuance of summonses pursuant to 41 U.S.C. § 114(b) filed by plaintiffs [151] in connection with their response to the mo-

tions by Messrs. Goodthunder and Prescott to file a brief as *amici curiae* is DENIED.

The motions for protective order filed by the Anonymous Walker group and the Anonymous Blair group [147, 206] are GRANTED IN PART and DENIED IN PART. The protective order previously entered [45] shall also apply to the anonymous plaintiffs in the various groups of intervening plaintiffs.

The Joint Motion for Order Regarding Early Meeting of Counsel, Joint Preliminary Status Report, and Preliminary Scheduling Conference and Scheduling Order [249] filed August 18, 2006, is DENIED without prejudice because that motion is premature.

In *Cermak v. United States*, No. 01–568L, the motion for entry of final judgment filed by the government is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as the *Cermak* plaintiffs' takings and breach-of-duty claims are concerned. Because the *Cermak* case has been pending for some time, either in the District Court for the District of Minnesota, the Court of Appeals for the Eighth Circuit, the Court of Appeals for the Federal Circuit, or this court, and there is no just reason for delay in entering a final judgment, the Clerk is directed to enter a final judgment under RCFC 54(b) dismissing the aforementioned two claims. The government's motion is denied insofar as the trust-mismanagement claim is concerned. For that claim, reconsideration is GRANTED with respect to the prior order entered September 3, 2002, and the dismissal of that claim by that order is vacated. The trust-mismanagement claim is reinstated, and the part of the *Cermak* case consisting of that reinstated claim shall be and is consolidated with the *Wolfchild* case. The *Wolfchild* case shall be designated as the lead case, and the caption of the consolidated cases shall show the *Wolfchild* case but not the *Cermak* case.

IT IS SO ORDERED.

---

**32.** The McDonald group filed a motion to intervene [175] but subsequently filed a motion to withdraw that motion [189]. The motion to withdraw is GRANTED.

**33.** The motions for counsel representing these groups to appear by telephone [201, 204, 209, 211, 214, 217] at the hearing held on July 18, 2006, were previously GRANTED. The Motion for Clarification of Order filed by the DuMarce group [239] is DENIED as moot.

## ADDENDUM A

TO: Prairie Island Indian Community

Shakopee Mdewakanton Sioux (Dakota) Community

### *SUMMONS*

Pursuant to 41 U.S.C. § 114(b), you are hereby summoned and required to appear as a party to the above-entitled action to assert or defend your interest or interests that are subject to the proceedings before this Court. Attached are two copies of plaintiffs' Third Amended Complaint in this action, along with a copy of the court's opinion and order dated August 22, 2006 directing that this summons be issued. In this connection, please note also that the complaints of 36 different groups of individuals who filed motions to intervene in this action, which motions the court granted, will be filed pursuant to the court's opinion and order.

You have forty (40) days from the date of service of this Summons to appear and file your response, exclusive of the day of service.